## The District Township of the City of Dubuque v. The City of Dubuque.

The great object and office of all rules or maxims of interpretation, is to discover the true intent and meaning of a law or constitution.

In arriving at this intention, the whole, and every part of the instrument, or enactment, is to be taken, and compared together.

The real intention, when once accurately and indubitably ascertained, wil prevail over the literal sense of the terms employed in the instrument.

When the words are explicit, they are to govern, of course. If they are not explicit, then recourse is to be had to the context, the occasion and necessity of the provision, the mischief felt, and the remedy in view.

Affirmative words may, and often do, imply a negative of what is not affirm'ed, as strongly as if expressed.

So, also, if by the language used, a thing is limited to be done in a particular form or manner, it induces a negative that it shall not be done otherwise.

Affirmative expressions that introduce a new rule, imply a negative of all that is not within the purview of the rule.

The constitution of the state of Iowa, confers upon the board of education, the primary power to provide for the public instruction of the s ate.

The act entitled "An act for the public instruction of the state of Iowa, approved March 12, 1858, so far as it provides for a system of education for the state, is unconstitutional, and void.

Under the constitution, the general assembly possessed no primary power to pass laws providing for the public instruction of the state, until the board of education was elected and organized.

*Appeal from the Dubuque District Court.*

THURSDAY, DECEMER 9.

Two suits to recover school moneys and school property upon an agreed statement of facts, as follows :

" It is agreed that, on the third day of May, A. D., 1858, an election was held in the city of Dubuque, for the purpose of electing officers for a school district, under the school law of March 13th, 1858; and that, at said election, Henry A. Wiltse received a majority of all the votes cast at said election, for the office of president of the board of directors; that Frederick E. Bissell received a majority of all the votes cast at said election, for the office of vice president of said board of directors ; that Peter B. Cook received a majority of all the votes cast at said election, for secretary of said board of directors; that James Mullen received a majority of all the votes cast for the office of treasurer of said school district ; and that each of the aforesaid officers were duly sworn, qualified, into office under said act, and entered upon the discharge of their respective offices, and have *de facto* exercised the duties of their respective offices.    It is further agreed that, prior to the act of the 13th of March, 1858, the city of Dubuque constituted one school district, and acquired property ; and that the city council of said city had the full control and management of the school in said city, and all the school property.    It is admitted that the city of Dubuque comprises the same area, and the same inhabitants.    It is admitted that the city of Dubuque has received from the school fund commissioner, and other sources, the sum of seven thousand one hundred and ninety-one dollars and ninety-eight cents, over and above the amount drawn on the treasurer for school teachers' wages ; and that there is the sum of twelve hundred and sixty-three 85-100 dollars of taxes for school teachers' wages, levied by the city of Dubuque, due and uncollected.

It is further agreed, that the following questions are submitted upon the following facts:

1.  Is the law of March 13th, 1858, under which the plaintiff claims to act, constitutional ?

2.  Is the plaintiff a legal corporation, under the name of "District Township of the city of Dubuque ?"

3.  Is there a legal board of directors of the said "District Township" of the city of Dubuque organized, and authorized to act for the said corporation ?

4.  Is the said corporation the legal successor of the city of Dubuque, as to the school property ; and does the title to same vest in the said corporation ?

It is hereby further agreed, that if the court shall render judgment in favor of the plaintiff, upon the points above stated, the court shall also render judgment for the amount due the teacher's fund from said city, and that the settlement of the accounts between the plaintiff and defendant, as to the school-house fund, and the $4,708,75 of orders held by plaintiff, may be settled by the parties amicably, or referred to referrees, as may be hereafter arranged by the parties." Judgment was rendered for the plaintiff in both cases, and the defendant appeals.

*John Dowd, Jr.*, and *Wilson & Utley*, for the appellant.

I.  The act of March 13, 1858, entitled " an act for the public instruction of the State of Iowa," is repugnant to, and inconsistent with, article nine of the constitution, and void.

It is evident from sections 1, 3, 4, 5, 6, 7, 8, 10, 12, 13, and 14, of the ninth article, that the constitution intended to organize a legislative body, which should be independent of the general assembly, and have original and exclusive jurisdiction over the school interests of the state, in all matters of legislation ; and this appears from the language expressed, giving the board of education general power over the subject matter of educational interests, and defining their powers and duties.  Where the constitution creates an office, and provides a board of persons to per-

form the duties of the office, the legislature has no power to create a new office, or provide another board, or different persons, to perform such duties. *Warner* v. *The People*, 2 Denio, 272.

11.  The power of the general assembly is expressed to be : To repeal all acts, rules and regulations of the board of education, or alter or amend the same ; to provide for the contingent expenses of said board; and after 1863 to abolish, or re-organize, said board, and provide for the educational interests of the state, in any other manner that to them may seem best and proper.  No other power being given to the general assembly to legislate in relation to school interests, but on the contrary, the board of education being clothed with full power and authority, and it being made their duty, by article nine of the constitution, to legislate on all matters pertaining to the school interests ; (section 8, article 9); and to provide for the education of all the youth of the state, (section 12) ; the style of these acts being defined, (section 14) ; and their acts having the force of law, (section 7) ; their duty to keep a journal and distribute the same ; their mileage and per diem allowance, all similar to the general assembly, is equivalent to the express declaration of the constitution, that said board should have exclusive original jurisdiction in legislating on all subjects pertaining to school interests in this state until 1863.   See 1 Kent's Com., (8th ed.) 517, note *d;* Hobart's Rep., 298 ; art. 9 of the constitution.

Where a statute limits a thing to be done in a particular form, it includes in itself a negative, viz : that it shall not be done otherwise. Plowden, 206.  Affirmative words in a statute, do sometimes imply a negative of what is not affirmed, as strongly as if expressed.  Nott, J., in *Cohen* v. *Hoff*, 2 Treadway, 661. *Expressio unius est exclusio alterius.* Brom's Legal Maximss, 422; 1 Bouvier Inst., 412. Section fifteen of the ninth article of the constitution, demonstrates clearly, that the intention of the makers of the constitution, was to withhold from the general assem-

bly the jurisdiction and power to legislate concerning school interests until 1863.

*Second.* The provisions of the act of March 13, 1858, conflict with article nine of the constitution, by providing for a class of officers, commissioners, presidents, superintendents, districts and boards, wholly different from that specified in the constitution, as will be seen by reference to chapter £2 of Laws 1858, p. 57.

If the provisions of the act of March 13th, 1858, are valid, the ninth article of the constitution becomes nugatory ; for the system contemplated by it, and that contemplated by said act, cannot both exist at the same time ; and inasmuch as the general assembly itself, which passed the act, existed and acted by virtue of the same constitution, we rather incline to the opinion that, in case of conflict, the act of the general assembly must yield, and the constitution prevail. See article 12 of the constitution, section 1, which provides, that "this constitution shall be the supreme law of the state, and any law inconsistent therewith shall be void. The general assembly shall pass all laws necessary to carry this constitution into effect."

If said act of March 13, 1858, is valid, the hands of the new board, just elected pursuant to article 9 of constitution, will be completely tied, and they can do nothing when they meet, but to sit and gaze at each other in mute astonishment, in view of the vast extent of these powers, duties, and responsibilities, while there is nothing left for them to do. The general assembly has stolen the legislative march on them, and covered themselves with the glory of conceiving and bringing forth a complicated school system, *generis*, of ninety-six sections, and no matter how incompatible any of the provisions thereof may be with the interests of education—no matter how burdensome its inexplicable requirements, and numberless officers and subalterns may be to the people—the constitutional board of education are powerless to relieve. The general assembly have assumed their prerogatives, and be-

come superior to the constitution, by virtue of which it subsists.

The plaintiffs predict that very serious results would follow, if this act of March 13, 1858, be declared unconstitutional, in the disarrangement of school interests. But such would not be the case. The school system, in force at the adoption of the constitution, is now the only one of force and validity in this state, which the constitution designed to continue until changed, or modified, or repealed, by the board of education. See sec. 2, article 12, Const., which provides that, " all laws now in force, not inconsistent with this constitution, shall remain in force until they shall expire, or be repealed."

Plaintiff claims that, admitting that said board of education, when duly organized, would have original and exclusive jurisdiction over the legislature for school interests, still the general assembly could legislate on the subject before the organization of the board. But if the general assembly have not jurisdiction of the subject after the organization of the board, it is impossible it could have it before, when the same constitution provides for both, and makes the board as distinct and independent a legislative body on school matters, as the general assembly is on other matters. The makers of the constitution could not have intended that the general assembly should anticipate and assume the duties and prerogatives of the board, and institute a system of things which could only exist until the organization of the board.

III. There is not elected in the alleged district township of the city of Dubuque, any board of directors, according to the provisions of said act of 13th March, 1858. See sections 1, 4, 5, 8, 10. It is not pretended that there were any officers elected, except a president, vice president, secretary, and treasurer. Their duties are defined in sections 11, 13, 15, 17, 18, 19, 20, 23, 24, 25, 26, 27, and the following sections.

For further authorities, see 2 Scam., 79 ; 11 Maine, 118 16 Ohio, 599 ; 3 Brevard, (S. C.), 533.

268    SUPREME COURT CASES—1858.

The District Township of the City of Dubuque v. The City of Dvbuque.

*Bissell, Mills & Shiras*, for the appellee.

The defendant claims that the law of March 13th, 1858, is unconstitutional, because the constitution, article 9, first part, provides that " the educational interests of the state shall be under the management of a board of education," &c. Section 8, same article, provides, that the board have power to regulate and make all needful rules and regulations in relation to common schools, &c.; but all acts, rules, and regulations of said board, may be altered, amended, or repealed, by the general assembly, &c. Section 10 provides, that the board have no power to levy taxes, or make appropriations of money, &c. Section 7, article 12, provides, that the board are to be elected at the general election, in October, 1858, and their first session shall be in December, 1858. Section 7, article 9, provides, that the acts of the board do not take effect until they have been published and distributed in the counties, townships, and school districts.

The constitution does not prohibit the general assembly from legislating on the subject of education; but in article 9, part 2d, leaves the school funds and lands, under the control and management of the general assembly. The general assembly may strike out all but the enacting clause of any act of the board, and amend by any provision it may choose; thus leaving the whole power virtually in the hands of the general assembly. Without the prohibition, in article 9 of the constitution, the general assembly would have full power to legislate as it *did*, in the act of March 13th, 1858. It is not prohibited by express provision of the constitution, and it still has full power, unless a prohibition is implied from article 9, of the constitution, and this can only be implied, because the constitution has conferred the same power upon another body.

It was settled in the case of *Sturges* v. *Crowningshield*, 4 Curtis, and is the uniform decision of all courts of the United States, that merely giving congress, or any other

constituted body, the power to legislate on any subject, did not prohibit the state from acting on the same subject, until congress has acted on the subject.   This case, and the decision, is in point, in the case now pending, and establishes the principle, that until the board of education is constituted, and has acted on the subject, the general assembly has full power and authority to act.

Courts will not declare a law unconstitutional, unless clearly and palpably so.   We cannot, therefore, conceive that it is necessary to enlarge on this point, when we see that by declaring this law unconstitutional, it leaves the state without any school system, and without power to have one, until the board of education act on the subject. See *Larabee* v. *Talbott*, 5 Gill., 426, in which it is decided, that the late bankrupt law of the United States, which was enacted August 19, 1841, and which expressly provided, that it should take effect only from and after February 1st, 1842, did not suspend the operation of the state insolvent laws until February 1st, 1842.

The second point involves the question, as to whether the plaintiff is a legal body, and includes the question as to whether the city of Dubuque is a sub-district, or a district township.   Session law of 1855, 15, constitutes the city of Dubuque, one permanent school district, and substitutes the city council for the board of trustees, as provided by the general law.   It also provides that all monies received from the school fund commissioner, or collected from any tax, shall be kept by the treasurer, in a separate account from other funds, and only paid out on orders for the purpose for which the same was received.

The law of March 13th, 1858, leaves the school district the same as before, but transfers the control over its affairs from the city council to the board of directors, in the same manner as in 1855, it had transferred the power from a board of trustees to the city council.   The law of March 13, 1858, makes the district township the legal body, or corporation, and the financial manager of the schools in the

township.   It provides that that part of the township out-side of the city, shall be considered as a separate township, evidently contemplating the city for one township, and that part outside, another.   Section 5 provides that every school district, (and the city of Dubuque was one), is made a body corporate by the name "district township of" (the city of Dubuque, &c.)   The sub-district only elect óne di-rector, and he is to act as one of the district township board, (section 12), and it certainly cannot be claimed, that the city of Dubuque, was to be a sub-district, not a body corporate, and controlled by one man.   We therefore say, the city of Dubuque was made a district township, and is a legal corporation by the name in which the suit is brought.

The next question is in regard to the legality of the board of Directors, as organized, and the only question in this is, whether the city was not constituted a sub-district, as well as a district township, and therefore entitled to one sub-di-rector, who would be a member of the board for the district township, thus making that board four instead of three. We can see nothing in the law, or in reason, for this opin-ion; but, even if it was so, it would not destroy the district township board by a failure on the part of any sub-district to elect a sub-director.   If a sub-director was asking a seat in the board, which was refused, then this question would arise, but cannot arise until the city, claiming to be a sub-district, shall elect a director, and ask to be represented in the board.

We cannot see that there is a shadow of doubt but that the law is constitutional, and that the proceedings have been regular and legal; and that the plaintiff is entitled to judgment for the matter claimed in each of said cases, now submitted to the court.   See 14 Conn., 457; *Willsmentre School* v. *Windham School*, 2 Johns., Ch. 320; Hop.' Ch., 288; 38, Maine, 32; 25, Pick., 62.

WRIGHT, C. J.—By the 24th section of chapter 210, of the laws of 1857, p 343, the city of Dubuque was constituted

one permanent school district, subject to the council of said city, whose duty it was to provide for the adequate support and maintenance of common schools in said district. By the same act, the city council was required to provide for the appointment of a board of education, to whom should be given the management of the common schools of the district.

Chapter 52, of the laws of 1858, p 57, constitutes each civil township in the several counties of the states a school district for all the purposes of said act :

"Provided, That each incorporated city or town, including the territory annexed thereto for school purposes, and which contains not less than one thousand inhabitants, shall be, and is hereby created, a separate school district, which shall elect its officers in the same manner that officers are elected in other school districts ; and the electors of said district shall possess and exercise the same powers, and perform the same duties, as are, by this act, required of like officers in other school districts ; and said district shall be, in all respects, subject to the provisions of this act, so far as the same are applicable ; and the remaining part of such township or townships shall each be considered as a separate township, as provided in this act."

Under this law, the electors of the district composed of Dubuque city organized and elected a president, and the other officers designated in section 8. These officers, acting for, and in the name and behalf of the district so organized, claimed of the city of Dubuque the school money, ("school house and teachers' fund") in the hands of its officers, and also the possession and control of the property, real and personal, belonging to the district. The right of the new organization to this money and property was denied, and these suits were brought to recover the same, the one for the money, and the other to test the title to, and obtain possession of, the real property.

The ground upon which the plaintiff's right to recover is resisted, is that the act of 1858, entitled " an act for the

public instruction of the state of Iowa," was not passed or enacted by the body or power entrusted with such legislation under the constitution. And thus we have presented the question, whether the general assembly had the power to pass the act, or whether, under the constitution, this power is conferred exclusively upon the board of education. Our conclusion is, that the constitution designed primarily to confer the power to legislate upon this subject upon the board of education, and not upon the general assembly. Our reasons for this conclusion, we shall, as briefly as possible, proceed to state.

Article 9, of the constitution, provides :

Sec. 1.    The educational interest of the state, including common schools and other educational institutions, shall be under the management of a board of education, which shall consist of the lieutenant governor, who shall be the presiding officer of the board, and have the casting vote in case of a tie, and one member to be elected from each judicial district in the state.

Sec. 6.    *    *    *    They shall keep a journal of their proceedings, which shall be published and distributed in the same manner as the journals of the general assembly.

Sec. 7.    All rules and regulations made by the board shall be published and distributed to the several counties, townships, and school districts, as may be provided for by the board, and when so made, published, and distributed, they shall have the force and effect of law.

Sec. 8.    The board of education shall have full power and authority to legislate and make all needful rules and regulations in relation to common schools, and other educational institutions, that are instituted to receive aid from the school or university fund of this state; but all acts, rules, and regulations, of said board, may be altered, amended, or repealed, by the general assembly ; and when so altered, amended, or repealed, they shall not be re-enacted by the board of education.

Sec. 10.    The board shall have no power to levy taxes,

or make appropriations of money. Their contingent expenses shall be provided for by the general assembly.

Sec. 12. The board of education shall provide for the education of all the youths of the state, through a system of common schools; and such schools shall be organized and kept in each school district at least three months in each year.

Sec. 14. A majority of the board shall constitute a quorum for the transaction of business; but no rule, regulation, or law, for the regulation and government of common schools, or other educational institutions, shall pass without the concurrence of a majority of all the members of the board, which shall be expressed by the yeas and nays on the final passage. The style of all acts of the board shall be, "Be it enacted by the board of education of the State of Iowa."

Sec. 15. At any time, after the year 1863, the general assembly shall have power to abolish or reorganize said board of education, and provide for the educational interests of the state, in any other manner that to them shall seem just and proper.

The constitution further provides that the educational and school funds and lands shall be under the control and management of the general assembly of the state. Section 1, of second subdivision of article 9.

Sec. 3. The general assembly shall encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement.

Sec. 7. The money subject to the support and maintenance of common schools, shall be distributed to the districts in proportion to the number of youths between the ages of five and twenty-one years, in such manner as may be provided by the general assembly.

The act of 1858, as its title imports, is for the "public instruction of the state." It contains ninety-six sections, and, with great particularity and minuteness, points out and defines the duties of the several officers provided for therein. It was the evident design of the legislature to

274    SUPREME COURT CASES—1858.

The District Township of the City of Dubuque v. The City of Dubuque.

cover the whole ground upon this subject. It commences by declaring each civil township to be a district—provides for sub-districts therein—for the officers in each, the time and manner of their election and qualification—for their respective duties—for the election of county superintendents and their duties—for a state superintendent and his duties—for a high school in each county—for the manner of selecting text books in schools—for the government of the state university, and for a normal department therein —for teachers' institutes—for a meeting of the several county superintendents in each year—for a meeting of the presidents of each school district, with the county superintendent, constituting a county board—for the establishment of scholarships in the high schools and university—for the raising of taxes to build and repair school houses—for the levying of a tax by the county judge for the support of schools—for reports from various officers to others, and from these to the general assembly and the board of education—and, in a word, for everything which, in the opinion of the legislature, was necessary to give to the state a complete and full system of public instruction. And then by section 95, it is enacted that " all acts and parts of acts which have heretofore constituted the school laws of the state of Iowa, except those relating to the school lands and the school fund, and all acts and parts of acts heretofore in force relative to the state university, are hereby repealed."

By chapter 158 of the laws of 1858, 391, complete provision is made for the management of the school fund, and the sale of the school lands. In this act, duties are imposed upon various officers in the management of this fund, and the sale of these lands—and directions are given for the expenditure and distribution of the moneys arising from time to time. The act covers the five per cent. fund, the five hundred thousand grant, the university lands, the proceeds of fines and lost goods—and, in a word, the entire fund set apart by the constitution for the support of common schools and the university.

SUPREME COURT CASES—1858.    275

The District Township of the City of Dubuque v. The City of Dubuque.

We have thus given somewhat at length, the several provisions of the constitution, as also a synopsis of the act under consideration, and that relative to the school fund and lands, that the question made might be the more readily and fully appreciated and understood.

The novelty of a question, not unfrequently invests it with seeming, if not actual, difficulty.   And hence in this case, the peculiar department introduced and provided for in the board of education—the introduction of what is termed a fourth power in the government, leads the mind to hesitate in defining its powers and prescribing its duties. The fact that legislative power upon all subjects is uniformly committed to a body known as the general assembly, or by some similar name, naturally leads us to doubt whether the constitution intended to divide or separate this power, by conferring a portion of it upon another and distinct body.   And yet there is certainly no reason why the same rules of construction are not applicable to this as to every other question of legal or constitutional interpretation.   If the result of the application of these rules, shall be to recognize a portion of legislative power in a new and unusual body, it is none the less our duty to so declare, than if the result left the power in the usual and accustomed channel.

What are some of these rules ?   We remark first, that the great object and office of all rules or maxims of interpretation is to discover the true intention of the law or constitution.   This once certainly and clearly ascertained, courts are bound to obey it, however much they may doubt its wisdom or policy.   [This last remark has reference to a constitutional provision; for, as applied to law, there must be the further requisite, that it does not violate the constitution.]   In arriving at this intention, the whole and every part of the instrument or enactment, must be taken and compared together.   The real intention, when once accurately and indubitably ascertained, will prevail over the literal sense of the terms.   When

the words used are explicit, they are to govern, of course. If not, then recourse is had to the context, the occasion and necessity of the provision, the mischief felt, and the remedy in view. Affirmative words may, and often do, imply a negative of what is not affirmed, as strongly as if expressed. So, also, if by the language used, a thing is limited to be done in a particular form or manner, it includes a negative that it shall not be done otherwise. Affirmative expressions that introduce a new rule, imply a negative of all that is not within the purview. 1 Kent, 461, marg., *et seq.*, note d, 467.

We therefore take the whole, and every part of the constitution, bearing upon this question, into consideration and ascertain the intention of the convention. By this constitution, what powers are conferred upon the board of education? We answer generally, legislative powers upon the subject of the educational interests of the state. This is plainly indicated and shown by such language as this : "The educational interests shall be under the management of a board of education." "They shall keep a journal of their proceedings, which shall be published." "All rules and regulations made by the board, shall be published and distributed, and when thus distributed, they shall have the force and effect of law." "The board shall have full power and authority to legislate, and make all needful rules and regulations in relation to common schools," &c. "The board shall provide for the education of all the youths of the state, through a system of common schools." "No rule, regulation, or law, for the regulation and government of common schools, or other educational institutions, shall pass without the concurrence of a majority of all the members." "The style of all acts of the board shall be, 'Be it enacted by the board of education of the state of Iowa.'"

It seems to us that language could not much more clearly express the intention of the convention. *First.* This great and absorbing interest is placed, by the use of express words, under the management of a board, com-

posed of but few persons, selected from all parts of the state. In managing it, they are told what they may do, and how to do it. They may legislate—provide for a system of common schools—make rules and regulations which, when published and distributed, shall have the force and effect of *law*. What force, or effect, could these provisions have, if the board has no power to enact what is commonly denominated a school law? If they have not this power, what was the object of the organization?

But, again, let us look at the object had in view in creating this board—the mischief that was supposed to exist, and the remedy contemplated. No higher obligation rests upon the statesman, or legislator, than to provide some certain and adequate means for the education of the people. This duty, as shown by the debates of the convention which formed the constitution, was regarded as having been much neglected. Our former school law was admitted to be defective. In the haste of general legislation—while legislators were so much influenced by political considerations—and so many other matters absorbed their attention—it was deemed advisable to entrust to another tribunal the educational interests of the state—a tribunal selected because of its fitness to legislate upon this important subject—a tribunal that it was supposed would come to the discharge of the duties, fully impressed with their magnitude and delicacy. If, however, full, or equal power still exists in the general assembly to legislate upon the general subject, as before, or under the old constitution, then this board was created for no practical purpose. What mischief would be remedied under such a construction? This board could not act after the legislature had. They have no power to amend, alter, or repeal anything that the legislature may do. On the contrary, when the legislature has amended, altered, or repealed any act of the board, they are expressly prohibited from re-enacting the same. If the act under consideration, is constitutional, or if the general assembly may originate and pass such laws, then there would be nothing left for the board to do. And the

consequence would be, that the legislative power upon the subject, being left where it always had been, the object had in view in creating this board would be defeated, and the remedy designed would fail.

But further, it is not improper that we refer to the debates of the convention which formed the constitution, to ascertain the views entertained by its framers in providing for this board. And from these, we are left in but little doubt as to the intention. Two extracts must suffice—one in favor, and the other opposed to the measure.

Says Mr. Hall, (the admitted author of the system):

"I am, therefore, in view of these considerations, in favor of taking this matter entirely out the power of the legislature, and putting it into the hands of another body, who will better represent the interests of the people. I am for putting it into the hands of a body that shall have no control over the funds, and which cannot possibly be influenced by party considerations. Such a body as I propose, will be uninfluenced by partisan feelings and considerations, and their whole and undivided attention will be given to the benefit and improvement of the educational interests of the state."

"This system compels the legislature to divide the state into sixteen, (afterwards made eleven), educational districts, among which the money is to be distributed, in proportion to the number of unmarried youths, between the ages of five and twenty-one years. This is to be an equal distribution, and is made the duty of the legislature. The board of education provide the schools; they furnish the consideration for the money; they decide when the money shall be paid, and paid because it has been earned; and they superintend the establishment of the schools. This is made their duty." Debates, 751.

Mr. Wilson, in opposition to the system, said:

"I can see no possible good to grow out of this system, for it confers upon the board of education, legislative authority in every respect, except that, in connection with

SUPREME COURT CASES—1858.        279

The District Township of the City of Dubuque v. The City of Dubuque.

the school funds, and, at the same time, it retains in the hands of the legislature the power to repeal, alter, or amend, the acts passed by the board."

" The legislature cannot take upon themselves the power of enacting laws, and enforcing regulations, in relation to schools. They have to wait until this board has acted, and after they have acted, they can only change, or repeal, the rules and regulations which they have made."

" They, (the board), may pass a code of laws, distribute those laws throughout the state, and the general assembly, at its next session, may repeal one-half, or two-thirds of all these laws, or they may repeal them all, before the people have had an opportunity of testing them, and determining whether there is anything good in them. Once repealed, altered or amended, despite whatever good may have been discovered in them, this board of education will have no power to re-enact those laws, neither will the legislature, because you confer upon the board the power to make all the rules and regulations for the government of our schools. This power is taken away from the legislature, and given to this board." Debates, 941.

These extracts, it seems to us, sufficiently show the intention in creating this board, and that this intention was to confer legislative power over the general subject of schools and education. Other citations might be made, all tending to establish the same proposition, but these are sufficient.

It is urged, however, that in relation to the educational interests of the state, there are two branches—the one abstract, or educational, and the other financial—that under the abstract, or educational branch, is included the power to prescribe text books—adopt rules for the examination of teachers, and the like ; and that these things, or this power, was intended to be conferred upon the board. In other words, that this board was designed to take the place of the superintendent of public instruction, under the former constitution, and to perform the same class of duties de-

280     SUPREME COURT CASES—1858.

The District Township of the City of Dubuque v. The City of Dubuque.

volving upon him. But that, upon the other hand, it was reserved to the legislature to prepare the machinery—originate the system, and attend to the financial department.

To a certain extent this is true. That is to say, that the educational and school funds and lands were to be under the control and management of the general assembly. And under this power it was, that chapter 158 of the laws of 1858, was enacted. But what warrant is there for assuming that the powers and duties of this board were to be similar to those of the former superintendent of public instruction, or that they were to extend merely to the promulgation of *rules*, the recommendation of *text books*, and the like? It is not probable, to say the least of it, that the convention would have, at such an increased expense, transferred these duties from one to thirteen persons. If such was the design, it is not probable that the very act under consideration would have continued the office of superintendent. So far from this construction being favored, it is clearly and expressly negatived, by the general, as well as the specific, terms and language of the constitution. Thus, when by section 6, article 9, the board are required to appoint a secretary, who is to be the executive officer of the board, and to perform such duties as may be imposed upon him by them and the laws of the state, we infer that this secretary was designed to be substituted for the superintendent—that primarily his duties were to be defined by the board—that through him they would enunciate many of their rules and regulations for the more efficient working of the general system which they might bring into existence by law or their legislation. Not "only so, but this board is to "provide for the education of all the youths of the state, *through a system of common schools*." What does this mean? How could this be done—how could they thus provide, without the power to bring into existence the system, the means to accomplish the end? To thus provide, something more is necessary than to merely prescribe rules for the government of the officers, teachers,

SUPREME COURT CASES—1858.     281

The District Township of the City of Dubuque v. The City of Dubuque.

and pupils, after the system had been devised by another power.   To make it the duty of this body to accomplish so great a work, and, at the same time, deny them the ability—the power to devise the system—the efficient means to bring about the end—would be unreasonable and absurd.

Further: every rule, regulation, and *law, for the regulation and government of common schools, or other educational institutions*, must receive the concurrence of a majority of all the members, and full power and authority is conferred to *legislate*, and make all needful rules and regulations, in relation to common schools and other educational institutions.   What do these terms, "law" and "legislate," mean ?  The first is, an established, or permanent rule, established, of course, by the supreme power, or the power having the legislative control of the particular subject.   Thus, the general power to prescribe rules for the government of the actions of the subjects or citizens of a state, is confided to the legislative department.   What this legislature may prescribe, we call law.   What this board may do upon the subject entrusted to their care and supervision, is also called law.   So, also, to "legislate" is to give, pass, or enact a law or laws.   Thus, section 1, article 2, of the constitution, provides that "the legislative authority of this state shall be vested, &c."   And we ask, therefore, why give to this board the power to make laws and to legislate, if their duties were merely to carry into effect a law, or system, enacted, passed for, or given to them, by some other power ?  If such was the design, language could not have been selected to express more clearly the opposite intention.

Once more upon this subject.   The educational interest of the state is to be under the management of the board—their rules and regulations are to have the force and effect of law—and "the style of all acts of the board shall be, 'Be it enacted by the board of education of the state of Iowa.'"   How similar this last to the concluding part of section 1, article 2: "Be it enacted by the general assembly of the State of Iowa."   Why, we ask, this similarity

282     SUPREME COURT CASES—1858.

The District Township of the City of Dubuque v. The City of Dubuque.

—why are the laws, rules, and regulations, to go from this board with this authoritative and formal commencement, if the system was not to be created by a law emanating from the board—if their duties were not legislative? Why are their proceedings or enactments spoken of as acts— and thus the analogy kept up between their action and the general assembly? And why, if they were to make rules and regulations in contradistinction to laws and acts, were the latter words used? The use of the latter would clearly seem to indicate, that more power was intended to be given than merely to make regulations and rules, in the sense ordinarily attached to those terms, or in the sense that such power was, by previous laws, conferred upon the superintendent of public instruction.

It is further claimed, that until the board of education was elected and organized, the power to legislate upon this subject remained with the general assembly. This part of the argument may be stated thus: the first session of the board is, by the constitution, fixed on the first Monday in December, 1858. After the adoption of the constitution, and before their meeting, a session of the legislature was provided for, and it was not intended that all legislation upon the subject of schools, and the educational interests of the state should be suspended—that the act under consideration was passed before the organization of the board, and is therefore valid.

So much of this argument as is drawn from an assumed necessity for legislation, loses its force, when it is remembered that we had a school law, which, by the constitution, (article 12, section 2), was to remain in force until repealed. Not only so, but if the general assembly could pass this law, it must still continue in force, and remain the law, now that the board is organized, without any power on their part to amend or repeal. The necessary effect of this would be, that the legislature, and not the board, would " provide for the education of the youths of the state through a system of common schools." If the legislature could do this—the board having no power to alter or re-

peal—nothing would be left for them to do. The act imposes every duty upon an appropriate officer, which would seem to be necessary to the efficiency and due operation of the system. We have seen that it gives to the superintendent of public instruction, power to recommend to the several county superintendants, a uniform series of text books —that it provides a method for their discharge, for the ex. pulsion of pupils from the schools—and in a word, all needful rules and regulations are either prescribed therein, or the power to prescribe them is conferred upon some officer. What, then, are the board to do? They cannot amend this law. If they make a new law, and this one is valid, we would have two acts upon the same subject, for as has been seen, the board may now legislate, or make a law. If they prescribe rules and regulations for the examination of teachers— if they recommend a uniform series of text books—these duties are, by the law, devolved upon other persons, and in case of conflict, which must prevail.

We cannot believe that such possible conflict and confusion was ever designed, or that the constitution intended that the legislature should act or legislate upon this subject any more at the first, than at any subsequent session of that body. If it was so intended, then, as already suggested, there is nothing to prevent this law still continuing in force. No provision of the constitution can certainly be said to thus limit its operation, nor is such a conclusion favored by implication. The power, if in the legislature, cannot be said to depend upon the time of its exercise. If lodged there, it still continues, and may be exercised at any time hereafter. It is not there, however, because its exercise would be inconsistent and incompatible with the powers conferred upon the board, and repugnant to the obvious spirit and intention of the constitution. And this remark brings us to the last, and perhaps strongest position of appellee, and that is, that the legislative authority of the state is vested in the general assembly—that this means, and has reference to, all subjects—that this power is not taken away by express provision, as to the educa-

tional interests of the state, nor by such necessary impli-
cation as to confer it exclusively upon the board.

Much that has been said is applicable to this part of the
case. It is true, that by the constitution the legis-
lative power is vested in the general assembly. It is true
that this power is conferred without express exception or
qualification. It is true, also, that, as the law-making pow-
er, it may legislate upon all subjects not prohibited either
expressly or by necessary implication. But we have al-
ready determined that the board of education may legis-
late upon this subject. The only question, then is, whether
the legislature has concurrent or equal power, or whether
the power is exclusively in the board.

The expression of one thing, is frequently the exclusion
of another; and if by a law or constitution, a thing is to
be done in a particular manner or form, this, as we have
seen, includes a negative, that it shall not be done other-
wise. Where, also, the constitution enjoins a duty, it
gives by implication, every particular power necessary for
its performance—the implication being, of course, a ne-
cessary, and not a conjectural or argumentative one.
This rule, it is also said, is further modified by another,
that where the means for the exercise of a granted power
are given, no other, or different means can be implied, as
being more effectual or convenient. *Field* v. *The People*,
2 Scam., 79. Such a construction should also be given, if
possible, as that all parts shall stand, and have meaning
and force, according to the intention of its framers.

The duty imposed by the constitution upon the board of
education, is to provide for the education of the youths of
the state. The power to perform this duty follows impli-
edly, if not given expressly. If expressly given, then it
is not for the legislature or the courts, to say that some
other means or method would be more effectual or con-
venient. It is thus given, and with the wisdom or policy
of the provision, we have nothing to do.

But if we say that the legislature has concurrent or
equal power over this subject, in what condition would we

be placed? Our legislation upon this most important and vital interest, would present the anomaly of coming from two distinct, and, to a great extent, independent bodies. The legislature could pass a law. The board cannot in any manner change it. The board has to provide for a system of common schools, and however unwise or impolitic they may deem the means devised by the legislature, to accomplish that purpose, they must submit. So that, in fact, instead of having the power to perform the duties imposed upon them, the board might in advance be stripped of all their efficiency, and rendered unable to do that which, by the constitution, they are required to do.

But in case of conflict, which is paramount—which shall prevail—the legislation of the general assembly, or the board? Both cannot stand. The board can act, and we will not suppose that equal power was given to another body over the same subject. Power to legislate upon the subject of education, is conferred upon the board. The constitution has thus, in express words, imposed a duty and conferred a power. If we say that the legislature has the same power, it results from the general language of section 1, article 3. But to recognize this power in the legislature, is substantially to leave the first part of article 9 without meaning. To recognise the power as exclusively in the board, in the first instance, harmonizes the whole instrument, and renders reasonable and operative its several provisions. To give the board concurrent or equal power, would conflict with article 3, section 1, as much as to give them exclusive power. They have equal power, certainly, and hence it seems to us that the argument of appellees is stripped of all force.

We have said that the legislature had no power to pass the law under consideration. By this we do not mean, that every part of the act is necessarily void or inoperative. Without pointing out the particular parts which are valid or invalid, we propose to state our views of the division of power contemplated and intended by the constitution, in relation to this subject.

Laws for the levying of taxes—those making appropriations of money—and those for the control and management of the educational and school funds and lands—are to be passed by the general assembly. Those which provide a system of education, sometimes known by the name of "school laws"—those which create and designate the officers by and through whom the system is to be administered—are to originate with the board. After the board has acted, the legislature can alter, amend, or repeal, and therefore the action of the legislature in that respect concludes the board. This power of the legislature is much like the veto power given to the governor, over the acts passed by the general assembly. The governor is made a member of the board, but the acts of that body do not have to be approved by him, as do those of the legislature. The laws, rules and regulations of the board, when passed, do not need the concurrence of the legislature to become operative. When the legislature does act, such action is final upon the board. And thus, while the people have delegated to the board the power, and imposed upon them the delicate and responsible duty, of legislating for the well being of the children of the state, they have also given to another body, the absolute power to veto their action, and to pass all laws which provide for the raising of means to render effective any system devised.

The board, however, may enact a system looking to adequate laws on the subject from the legislature, or legislate with reference to funds provided for in existing laws.

This division, or arrangement, may not be politic. It may possibly result in confusion, and to the injury of the cause of education. If so, the remedy is not with this court. The people, through their constituted delegates, have made their constitution. It is our duty to declare what this constitution is, whatever the consequences, and not to alter or change it.

In the determination of this question, we may say, in conclusion, we have had much doubt and difficulty. No

view of it is entirely clear, or free from perplexity. After, however, giving full weight to the presumption that obtains in favor of the constitutional and legitimate action of the general assembly in passing the law, we have felt constrained to hold it void in its essential features. The board now in session can apply an immediate remedy, and obviate, as we suppose, to a great extent, any confusion or injury resulting from this conclusion. Thus impressed, we have had less regret, (if regret should ever be indulged in the discharge of duty), in thus construing the constitution.

Judgment reversed.