[Filed December 5, 1888.]

STATE OF OREGON EX REL. P. A. DAVIS ET AL., RESPONDENTS, v. ADOLPH WOLF ET AL., APPELLANTS.

BALLOT-PAPER — DUTY OF SECRETARY OF STATE. — Section 2507 of Hill's Code has shifted the duty of selecting suitable ballot-paper from the individual voter to the secretary of state.

BALLOT-PAPER — USE OF SURPLUS AT SUCCEEDING ELECTIONS. — Under section 2507, *supra*, a political committee may purchase of the secretary of state "such quantity or amount of paper as may be necessary or convenient," and its use is not limited to a pending election or the one next ensuing. The surplus, if any, may be used at any subsequent election.

TINTED PAPER — SECRETARY OF STATE. — If tinted paper be selected by the secretary of state and furnished for ballot-paper, ballots printed upon it are lawful and must be counted.

APPEAL from Marion County.

*J. J. Murphy, N. B. Knight,* and *H. H. Hewitt,* for Respondents.

*Shaw & Gregg* and *Tilmon Ford,* for Appellants.

STRAHAN, J. — This action is prosecuted by the state of Oregon upon the relation of P. A. Davis, John Hicks, J. C. Hayes, and E. L. Smith, against Adolph Wolf, M. Fitzgerald, George Sacra, and Archie Wolford, to ascertain by what authority the defendants hold and exer-

cise the office of councilmen of the city of Silverton, in Marion County, Oregon. The city of Silverton was duly incorporated by the legislative assembly in the year 1885.

It is alleged that at the regular election held in said city on the first Monday in May, 1888, the relators, being in every way qualified, were candidates at said election for the office of councilmen, and that they and one Ai Coolidge received the greatest number of votes for said office of councilmen, and were duly elected; that they accepted said office, and have been ever since said election and now are rightfully entitled to hold, use, and exercise said office of councilmen in said corporation; but that notwithstanding the election of said relators, the defendants, Adoph Wolf, M. Fitzgerald, George Sacra, and Archie Wolford, on the eleventh day of May, 1888, and from hence hitherto, without any legal election, appointment, or authority whatever, have held, used, and exercised, and still do hold, use, and exercise, the office of councilmen of said city of Silverton, and claim to use and exercise the same, and to have and enjoy all the rights and privileges to the said office appertaining, which office and privileges the said defendants for all the time aforesaid have usurped, intruded into, and unlawfully hold and exercise, and still do usurp, intrude into, and unlawfully hold and exercise, to the great damage and prejudice of the relators.

The complaint prays judgment that the defendants are not entitled to the said office of councilmen, and that they be ousted therefrom, and further, that the relators are entitled to said office, and to assume the execution of the duties thereof, upon taking the oath prescribed by law, and that they be placed in possession of same, upon being qualified, and for costs.

The answer denies the material allegations of the complaint, and then contains the following affirmative matter: " And for a further and separate answer to said complaint,

the said defendants allege that they and one Ai Coolidge are, and for all the times mentioned in the plaintiff's complaint have been, the duly elected and qualified and acting councilmen of the said city of Silverton, mentioned in plaintiff's complaint, and that said defendants and said Coolidge are lawfully entitled to have, hold, use, and exercise the said office, and have been duly elected and qualified thereto, as by the law mentioned in plaintiffs' complaint provided. The plaintiffs' reply denied the new matter in the answer. By consent of parties, the case was tried by the court, and the following facts and conclusions of law were duly filed: —

1. That the city of Silverton is a municipal corporation situated within the county of Marion and state of Oregon.

2. That on the first Monday in May, 1888, an election was duly held under the charter of said city by the electors thereof, for the election of five councilmen and other officers of said city for the term of one year.

3. That at said election, as shown by the returns of the judges of the election, the relators P. A. Davis received 38 votes, John Hicks received 38 votes, J. C. Hayes received 37 votes, and E. L. Smith received 37 votes for councilmen; that the defendants Adolph Wolf received 38 votes, M. Fitzgerald received 36 votes, George Sacra received 38 votes, and Archie Wolford received 38 votes.

4. That at said election one J. W. Hicks offered to vote by properly delivering his ballot on which was the names of each of the relators, to the judges of election; that his vote was challenged on the ground that he had paid no tax. And the court here finds that said J. W. Hicks had not paid any county or state tax for more than two years prior to the said first day of May, 1888, or other tax, except what he had within less than one year prior to said election paid to the proper authorities of said city a license taxed against him by said city for keeping a boarding-

house within said city, which license tax was required to be paid to said city by an ordinance thereof.

5. That at said election one O. G. Sparks offered to vote by properly delivering his ballot, on which was the names of each of the relators, to the judges of election; that his vote was challenged on the ground that he had paid no tax. And the court here finds that said O. G. Sparks had not paid any county, state, or other tax for more than two years prior to said election, except that he had within less than one year prior to said election paid to the proper authorities of said city of Silverton a license taxed against him by said city, under an ordinance thereof, for carrying on, in said city, the business of making photographs.

6. That at said election one William Whitlock offered to vote by properly delivering his ballot, on which was the names of each of the relators, to the judges of said election; that his vote was challenged on the ground that he had not been a resident of said city for —— prior to said election. And the court here finds that said Whitlock commenced to reside in said city about September, 1887, and continued to reside and was a householder therein until about the 20th of December, 1887, when he left said city with his family and went to California, with the intent to benefit the health of his wife, and return to said city unless he found something better in California; that he made no permanent settlement or home in California, and returned to Silverton about the 15th of April, 1888, with his family, and has resided there ever since; that when he left for California, he left most of his property and household effects at Silverton.

7. That prior to said election the said city of Silverton had never levied any taxes to support the government thereof, except licenses.

8. That at said election there were two regular tickets voted. One was called and known as the citizens' ticket,

and the other as the prohibition ticket; that the citizens' ticket was printed on plain white paper, which had been procured as ballot-paper from the secretary of state but a few days before the election, and the defendants were regular candidates on the citizens' ticket.

9. That the prohibition ticket was printed on tinted paper that could be distinguished from white paper, which tinted paper was procured as ballot-paper from the secretary of state about one year before said election, and is the same kind of paper furnished by the secretary of state as ballot-paper, and was used by all parties at the general election of 1886 throughout the state, and was also used by all parties at the election of said city in May, 1887, and the relators were candidates on the prohibition ticket.

9 a. That at the time said tickets were prepared and printed, the parties on said tickets supposed they were being printed on legal ballot-paper, and so considered up to the time of said election, on the first Monday of May, 1888.

10. That after the voting had commenced there was some talking at the polls about the legality of the vote on the tinted paper, but that the voters who voted the tickets on the tinted paper thought they were voting legal ballots.

11. That the names of J. W. Hicks, O. G. Sparks, and Whitlock were recorded at the election among the names of voters, but their ballots were not put in the ballot-box and counted, but were returned to the board of councilmen of said city in a separate envelope, and two of them were identified, to wit, the ballots of J. W. Hicks and Whitlock. The ballot of O. G. Sparks being lost, its contents were proved.

As conclusions of law, the court finds: —

1. That the ballots on the plain white paper called the

citizens' ticket were legal, and the ballots printed on the tinted paper, and called the prohibition ticket, were also legal.

2. That J. W. Hicks, O. G. Sparks, and William Whitlock were legal voters, and that their votes should have been counted for each of the relators.

3. That the relators, P. A. Davis, John Hicks, J. C. Hayes, and E. L. Smith, were each of them duly elected councilmen of the city of Silverton at said election, on the first Monday of May, 1888.

4. That the defendants, Adolph Wolf, M. Fitzgerald, George Sacra, and Archie Wolford, are each unlawfully holding the office of councilman of said city.

Judgment of ouster was accordingly entered against the defendants, and also a judgment permitting the relators to assume the duties of said office, upon taking the oath prescribed by law. From this judgment the defendants have appealed to this court. Numerous errors are assigned in the notice of appeal, but we will only notice such as are presented on the arguments by the appellants, and all others must be deemed waived or abandoned.

1. The legality of all of the ballots cast for the relators is contested on two grounds: 1. Because they were printed on tinted paper; and 2. Because they were not printed on paper procured from the secretary of state for the purpose of being used *at said election of May, 1888.*

These two objections, though depending on different statutes, are so closely allied, that they will be considered together. The ballot system of voting was introduced in this state by an act of the legislative assembly passed in 1872. (Acts 1872, p. 39.) One of the provisions in that act is section 2533, Hill's Code, and is as follows: "All ballots used at any election in this state shall be written or printed on plain white paper, without any mark or designation being placed thereon whereby the same may be known or designated."

This section was before this court in *State ex rel. Mahoney* v. *McKinnon*, 8 Or. 494. In that case it appeared that one ballot written on colored *paper* was received and placed in the ballot-box, and one of the questions involved was whether this ballot could be counted. After quoting the above provision, the court say: "The voter in this instance is conclusively presumed to have had knowledge of this requirement, and to have had it in his power to comply with it by using a proper ballot. It was a matter entirely under his own control, and if he chose to disregard the law, he cannot complain if the consequence was that his vote was lost."

Whether this court as now constituted would hold this statute to be mandatory, and not directory, and thus affirm this construction, it is not now necessary to consider, for the reason that the enactment of a subsequent statute on the same subject, presently to be referred to, has shifted the duty from the voter to the secretary of state to provide suitable ballot-paper.

But, aside from the effect of the latter statute, I would be loth to hold that a ballot innocently printed on *tinted* paper and used would be for that reason illegal. A slight coloring or tincture distinct from the ground or principal color makes the paper *tinted*. To make paper *tinted*, then the coloring or tincture distinct from the principal color must be *slight*. It would be a harsh construction of this statute to disfranchise one half of the voters of the city of Silverton for a *slight* departure from the letter of this statute, when no design to evade the law or fraudulent purpose is made to appear. But the statute of February 28, 1885, section 35, relieved the voter of the duty of selecting ballot-paper, and imposed it upon the secretary of state. That provision is found in Hill's Code, section 2507, and is as follows: "At every general, special, or municipal election hereafter held in this state

in pursuance of law, each elector shall in full view deliver to the chairman of the judges of election a single ballot or piece of paper, on which shall be written or printed the names of the persons voted for, with proper designation of the office which he or they may be intended to fill. No ballot shall bear upon the outside thereof any impression, device, or color, or thing designed to distinguish such ballot from other legal ballots, or whereby the same may be known or designated. No ticket must be used at any election, or circulated at the day of election, unless it is written or printed on paper furnished by the secretary of state for the purpose; and it is hereby made the duty of the secretary of state to procure and furnish, on application and payment to him of the actual cost thereof, with ten per centum thereof added, which percentage shall be his compensation, to the state central committee, county committee, or other managing committee of any political party or organization in this state, such quantity or amount of paper as may be necessary or convenient."

It appears from the ninth finding of fact that the prohibition ticket was printed on paper procured from the secretary of state about one year prior to this election, to be used as ballot-paper, and that all parties then used it. This section transfers from the voter to the secretary of state the duty of selecting suitable ballot-paper, and every voter has the right to assume that that officer has discharged his duty properly. If paper be used by the voter as ballot-paper that was furnished by the secretary of state for that purpose, such voter ought not to be disenfranchised, although such paper should appear not to be "plain white paper," but *tinted*. It is the paper selected by the officer appointed by law to make the selection, and if he should err in judgment or innocently make a mistake as to the color, I cannot see why the voter's rights should be denied him. But it was argued by ap-

pellant's counsel that to make this law effectual, and to accomplish the purpose of the legislature, it must be so construed that a committee wishing to procure ballot-paper must do so immediately preceding each election, and that if a surplus be left over, it could not be used at the next succeeding election. There might be force in this suggestion if it were addressed to the law-making power; but we cannot adopt it. That would require legislative power. Under this statute as it stands, the political committee may purchase of the secretary of the state "such quantity or amount of paper as may be necessary or convenient," and its use is not limited to a pending election. There is nothing in the statute prohibiting the use of any surplus at the next succeeding or any subsequent election. The objections to the legality of the ballots cast for the relators cannot therefore be sustained on either of the grounds taken at the argument.

2. Some attempt was made by counsel for appellants to criticise the finding of fact as insufficient to justify the conclusions of law. It is claimed that the court did not find when the returns of the election were made to the city council, or that the council ever refused to canvass said returns, or that they ever had an opportunity to do so.

To these objections it may be replied that the findings of fact by the court are more minute than the allegations of fact in the pleadings on either side. It may be true that the ultimate facts upon which right depends ought to have been more particularly stated in the complaint; and so ought the defendant's title to the office have been more fully alleged in the answer. The new matter in the answer is nothing more than legal conclusions dependent upon facts which the pleader has not seen proper to disclose. With such a pleading a party cannot be heard to say that the court's findings are not sufficiently specific.

Being satisfied that the court reached the proper conclusions as to the law, the judgment appealed from must be affirmed.

### ON PETITION FOR REHEARING.

[Filed January 19, 1889.]

STRAHAN, J.—Appellants' counsel have filed a petition for a rehearing, in which they insist with much apparent confidence that our former opinion is erroneous. They think if we would supply a supposed ellipsis by inserting the word "any" in connection with the word "election" in section 2507, the construction which they insist upon would follow. We do not attempt to determine whether that would be so or not. To do what counsel insist we ought would be to violate the letter of section 694, upon which they rely by "inserting what has been omitted." It would also violate established canons of construction. (Sedgwick on Statutory and Constitutional Law, 245, 246.)

After saying in effect that *the thought which the statute expresses* is to be sought for, the author proceeds: "If thus regarded, the words embody a definite meaning which involves no absurdity and no contradiction between the different parts of the same writing, then that meaning apparent on the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed. In such case there is no room for construction. That which the words declare, is the meaning of the instrument. "It is only where the statute is ambiguous in its terms that courts exercise the power of so controlling its language as to give effect to what they may suppose to have been the intention of the law-maker. In the statute before us the language admits of but one construction. No doubt can arise as to its meaning. It must therefore be its own interpreter." (*Bidwell* v. *Whitaker*, 1 Mich. 469.)

There is no ambiguity or uncertainty in the language used in the act before us. The sense is complete.

The effect of appellants' contention is, that we ought by some kind of construction to supply language to carry into effect what is assumed to have been the intention of the legislature, and this we hold is beyond the power of the court. The elective franchise is a sacred political right, which the law seeks to guard and protect, and not to destroy.

All laws for the government of elections were designed to enable the elector to signify his will by his ballot, and to give that will proper force and efficacy. Our institutions rest upon the fundamental idea of a free ballot, and it would never be safe to say that the means designed by law to secure the right should be used as the most effective weapon for its destruction.

In passing upon the questions submitted in this case, the court has not felt justified in adopting any narrow or merely technical rule. The right involved is too important to be dealt with in that spirit. The voters all used paper furnished by the secretary of state for that purpose, and were therefore within the letter of the statute. They were qualified electors, and no fraud is alleged or shown.

The court is asked to disfranchise them on the sole ground that the paper was tinted, and had been furnished by the secretary of state one year prior to this election, and this was a remnant left over. There was enough to answer the purposes of the second election, and we are unable to find any law prohibiting its use.

We apply section 694 of the code to this case, and simply ascertain and declare what is, in terms or in substance, contained in the statute, and decline to insert what has been omitted, or to omit what has been inserted. It belongs to the legislature to do that.

All the matters presented by the petition for a rehear-

ing were fully considered when the case was before us; and while it is possible we may have erred, we gave the case an attentive examination, and see no cause to change the conclusions already announced. A rehearing must therefore be denied.