## KELLOGG V. HICKMAN.

1. ELECTION — BALLOT — VOTERS.— The legislative intent of the requirements of section 1281, General Statutes of 1883, as to the form, size, color of paper, etc., of ballots to be used by voters, and making it unlawful to print for distribution, or to distribute at the polls, ballots not conforming to the requirements thereof, was to guard the secrecy of the ballot, and secure to the voter the right of suffrage free of restraint; but after a ballot has been voted, received

and counted, the courts are not authorized, in the absence of constitutional restrictions as to the manner of exercising the right of suffrage, in declaring such ballot illegal merely because printed on paper of different quality, color or dimensions from that prescribed in the section mentioned.

2. RIGHT OF SUFFRAGE — ACTS REGULATING NOT TO BE EXTENDED BY CONSTRUCTION.— An act should not be extended by construction beyond the letter thereof so as to deprive an elector of his right of suffrage, but courts should restrict the exceptions which exclude the ballot where the spirit and intent of the law is not thereby violated.

3. RETURNS — IRREGULARITIES.— Mere irregularities in returning the ballots and poll lists, in the absence of fraud, will not necessarily vitiate the returns.

4. QUALIFICATIONS OF VOTERS.— For a discussion of the questions relating to residence, citizenship, intention at time of settlement, and other qualifications necessary to constitute a legal voter, see cases discussed in opinion.

*Appeal from County Court of Bent County.*

HENRY KELLOGG appeals from the decision of the county court declaring his competitor, T. J. Hickman, elected county treasurer of said county.

Messrs. J. C. COAD, JAS. M. JOHN, E. O. WOLCOTT and J. F. VAILE, for appellant.

Messrs. PATTERSON & THOMAS, WAY & PAGE and J. F. BOSTWICK, for appellee.

STALLCUP, C. The appellant was declared elected to the office of county treasurer of said county of Bent, at the election held November 8, 1887, by a majority of eight votes over his opponent, the said appellee. The contestor alleged that illegal votes had been received and counted against him; also that votes had been illegally received and counted against him to his detriment. And the contestee alleged that illegal votes had been received and counted against him. The case was tried by the county judge of the said county under the provisions of the act approved April 10, 1885.

From the votes received and counted for appellant, who was the contestee, deductions were made by the said county judge as follows:

From the vote of Sheridan Lake precinct, forty-eight votes, on account of color and width of ballot, ten of the same being held illegal on the additional ground of insufficient residence of the voters in the state.

From the vote of Wilde precinct, thirty votes, on account of irregularities of the judges of election there, nine of the same being held illegal on the additional ground of insufficient residence of the voters in the state and precinct; and from other precincts, three votes on the ground of insufficient residence of the voters, — in all eighty-one votes deducted from those counted for appellant; and from the votes received and counted for appellee, eight votes were deducted on the ground of insufficient residence and other disqualifications of the voters. Whereupon judgment was given for the said appellee, from which the case comes here on appeal.

It is contended here for appellant that the court erred in all of the said deductions from the count for appellant.

1. Of the forty-eight votes of Sheridan Lake precinct, it appears that from a mistake in the directions the regular party ticket, by which appellant was named for the office of county treasurer, failed to reach the voting place of that precinct. Whereupon the tickets for said party were there printed on pale yellow paper three and a quarter inches wide, containing, along with the other candidates of said party, the name of appellant for said office of county treasurer, this paper being the nearest to the kind prescribed by the statute there obtainable upon which to print the tickets. Forty-eight of these tickets were accordingly voted, received and counted at this precinct. The good faith of the transaction is not questioned.

Section 1199 of our General Statutes provides that when it shall be found, on counting votes, that two or

more tickets have been deceitfully folded together, such tickets shall be rejected. Section 1281 provides as follows: "All ballots shall be written on plain white paper, or printed with black ink, with a space of not less than one-fifth of an inch between each name, on plain, white news printing paper, not more than two and one-half inches, nor less than two and three-eighths inches, wide, without any device or mark by which one ticket may be known or distinguished from another, except the words at the head of the tickets; and it shall be unlawful for any person to print for distribution at the polls, or distribute to any elector or voter, any ballot printed or written contrary to the provisions hereof; but this section shall not be considered to prohibit the erasure, correction or insertion of any name by pencil or with ink upon the face of the printed ballot." And section 1282 provides as follows: "When a ballot, with a certain designated heading, contains printed thereon, in place of another, a name not found on the regular ballot having such heading, such name shall be regarded by the judges as having been placed thereon for the purpose of fraud, and such ballot shall not be counted for the name so found.

By the statute it is unlawful to print or distribute tickets other than the kind prescribed in said section 1281. It is also declared that in the cases described in said sections 1199 and 1282 the judges of election shall not count the votes. No other cases are mentioned in which the judges of election are expressly authorized not to count the votes received. There is no claim that any fraud was intended or perpetrated in the premises.

I see no warrant in the statute for deducting these votes from the count. The courts are without authority to declare such penalty against the voter until the legislature shall have declared that the act of voting such ballot shall be unlawful, and that such ballot, if voted by the elector and received by the judges, shall not be

counted, and, in the absence of legislation to this effect, the courts may not declare as much.

The right to vote under our constitution is a vested constitutional right, with no condition imposed as to the manner of exercising the right, except that the vote be by ballot. That a right so vested and exercised — a vote so offered and received — may be defeated by force of legislative enactment at all, may be doubted. See *Daggett v. Hudson*, 54 Amer. Rep. 832, and note. However, conceding that an enactment expressly declaring against voting, against counting or knowingly receiving, ballots other than those prescribed may be sustained, still it seems clear that the exercise of such right by the elector may not be nullified by force of a strained and doubtful construction of an enactment containing no such expressions.

Such expressions are found in the enactments on this subject in California, Mississippi and Texas, and the exclusion of the prohibited ballots in those states, therefore, rests upon such direct expressions. See *Reynolds v. Snow*, 67 Cal. 492; *Steele v. Calhoun*, 61 Miss. 556; *Owens v. State*, 64 Tex. 509. The California statute provides that no ticket shall be used at an election, or circulated on the day of election, unless it is of a particular description prescribed; and it further provides that when a ballot, contrary to such description, shall be found in any ballot-box, it must be with all its contents rejected.

The enactment of 1880 of the state of Mississippi is like ours in this regard, except that it provides that a ticket different from that prescribed shall not be received nor counted. And the enactment of 1879 of the state of Texas is also similar to our statute in this regard, with the exception that it provides that any ticket not in conformity with the act shall not be counted. I find no case, and I think none can be found, where the deduction of such votes from the count is allowed in the

absence of legislative expression against counting or receiving the same. It will be seen that the enactment under consideration does not in terms prohibit the elector from voting a ticket printed on paper different from that prescribed; nor does it declare against the counting or receiving of any such ticket. The parties voting at an election are considered by some courts as parties to a contest of this kind. *Hopkins v. Olin*, 23 Wis. 319; *People v. Pease*, 27 N. Y. 45.

However this may be, it will be conceded that the rights of the electors voting are necessarily involved in contests of this kind; that their rights in the premises may not be ignored; that, to warrant the courts in depriving them of their votes as a result or penalty for having voted ballots printed upon paper different from that prescribed, there must be legislative expression to that effect. It is contended that it was the intention of the legislature, by the enactment under consideration, to deprive them of their votes when so cast, and that such intention is apparent from the act, notwithstanding the want of expression in this regard, and that such intention should govern, in order to give effect to this provision of the act.

It was stated in the oral argument that this section 1281 was taken from the Ohio act upon the same subject. Upon examination of that act I find that it declares that it shall be unlawful to publish, distribute or vote a ticket different from the ticket prescribed. The prohibition against the voter, being omitted in the act here, is significant, in that it tends to show that the legislature here did not intend to defeat the vote of an honest voter honestly voted, even if his ticket was of different paper from that prescribed, but did intend the provision in this regard for his protection in the premises; that is to say, the legislative intention to be gathered from the language used seems to be that no ballot except the kind prescribed should be printed or furnished to the voter, to

the end that his ballot might be secret, and that he might be clear of restraint or imposition of any kind in the exercise of his right of suffrage.

Upon a fair consideration of the statute it is not apparent that the legislative intent was to nullify such votes. See *Gilleland v. Schuyler*, 9 Kan. 587; McCrary, Elect. (3d ed.) §§ 190–193.

Inasmuch as section 1281 is an almost literal rescript of the Ohio statute, it has been suggested that there has been error in transcribing. The Ohio statute declares that "it shall be unlawful for any person to * * * distribute to any elector, or vote, any ballot printed or written contrary to the provisions hereof." Sec. 2948.

Section 1281 provides that "it shall be unlawful for any person to * * * distribute to any elector or voter any ballot printed or written contrary to the kind prescribed."

An examination of the enrolled act shows no error by the printer or publisher. The printing and punctuation are correct. No one can say that section 1281 is not as complete and grammatical as the Ohio act. If the change was unintentional it is certainly not apparent on its face. It appears to be the deliberate act of the general assembly, and it would be a most dangerous precedent for the courts to assume to change the express terms or language of a perfectly constructed statute, as changing a noun to a verb, and altering the punctuation, in order to correct the supposed errors of the law-making power. Such corrections must be made by legislative and not by judicial authority. Bishop on Statutory Crimes, section 199, says: "The circumstances will be rare in which any court will so extend an enactment by construction as to involve penal consequences not within the express words."

To attempt to correct section 1281, or give it the construction proposed, would be to declare the voting as well as the distribution of such ballots to be unlawful,

and would at least involve the penal consequences of disfranchisement to the voter, and the loss of lawful votes to the candidate.

The courts are inclined to restrict the exceptions which expressly exclude the ballot, rather than to extend them, and to admit the ballot if the spirit and intention of the law is not violated, although a literal construction would vitiate it. *State v. Phillips*, 63 Tex. 393; *Druliner v. State*, 29 Ind. 308; *Stanley v. Manly*, 35 Ind. 275; *Kirk v. Rhoads*, 46 Cal. 399.

Courts should not extend an enactment by construction beyond the expression of the act, so as to deprive an elector of his right of suffrage. When such consequences are involved the courts go not beyond the expression of the act. To deprive legal voters of their votes, after they have been in good faith by ballot cast and counted, without express statutory mandate therefor, would be an advance beyond all precedent, and, as I think, in violation of correct principles. 2 Bouv. Law Dict. 318.

2. As to the votes of Wilde precinct. There were thirty of them, and all for appellant. The judges had duly counted and tallied the votes, and had put the ballots into the ballot-box and sealed up the box, but had failed to sign the tally-lists or poll-books until the next day after the election, when one of the judges had departed; whereupon a messenger was sent with the said tally-lists or poll-books after said judge, who was overtaken by said messenger out on the prairie, twenty miles distant from the voting place, where he signed the said tally-lists, and gave them, with his key to the ballot-box, to said messenger, who returned them to the other two judges, who, at the house of one of them, signed the said tally-lists, opened the said ballot-box and put one of the said lists therein, and locked and sealed the said box, and regularly forwarded the same. It is clearly shown by the evidence that no fraud was perpetrated, that no changes were made nor injury of any kind inflicted, and

there is no evidence to show that any fraud or wrong was intended in the premises. Section 1200, General Statutes, provides that, when all the votes shall have been recorded and counted, the ballots, together with one of the tally-lists, shall be returned to the ballot-box, and the opening in the glass part thereof shall be carefully sealed, and each of the judges shall place his private mark on said seal. The wooden cover shall then be locked, and each of the judges shall preserve one of the keys thereof. I think it contrary to right and reason as well as to the authorities, to deduct these votes from the count by reason of such irregularities on the part of the judges on the day after the election, and barren, as they were, of harm to any one, and that the court erred therein. McCrary, Elect. (3d ed.) §§ 187–194; *Preston v. Culbertson*, 58 Cal. 198; *Gilleland v. Schuyler, supra.*

3. Referring now to the votes deducted from the count for appellant on the ground of insufficient residence in the state.

*First.* H. A. Jones. This voter testified at the trial, and stated that he arrived from Iowa at Sheridan Lake, on the 6th day of May, 1887, bought a lot in Sheridan Lake on the evening of May 7th, and agreed with the town company to erect a building for a hardware store on another lot, to be donated to him, and to do the same within thirty days; that he put up the hardware store, and in the meantime bought a relinquishment to a claim in the precinct with a house on it, and when his family came on June 26th he moved out to the claim, and was still living there at the time of the election and at the time of the trial. When he arrived at Sheridan Lake it was his intention to make that place his home. After leaving Iowa, he had no home for his family until he bought the relinquishment. His wife was visiting in Kansas. He had leased his house in Iowa. He left Colorado in May for his family, and returned in June.

In the cross-examination the following appears: "*Ques-*

*tion.* Now, Mr. Jones, when you started from Iowa to come west, you was not sure where you would locate? *Answer.* In one sense of the word I was. I had friends in Sheridan Lake with whom I corresponded, and I expected to locate. *Q.* You came out there, then, to see your friends, or to see the country? *A.* I came there with the intention of seeing my friends and the country. Yes, sir; I expected to see them. *Q.* You would not have located there if it had not suited you, would you? *A.* No, sir; I do not think I would. *Q.* If you had not liked the country, you would have gone where? *A.* To Iowa, I suppose. *Q.* To stay, would you? *A.* No, sir; I do not think I should. I would have looked elsewhere, I think." And there is nothing in the evidence contrary to the testimony of this voter.

By section 1150 of our General Statutes, as to residence, it is provided that a voter shall have resided six months in the state, ninety days in the county, and ten days in the precinct where he votes. Did the six-months residence of Jones in the state of Colorado commence as early as the 8th day of May? The domicile or residence, in a legal sense, is determined by the intention of the party. He cannot have two domiciles at the same time. When he acquires the new home he loses the old one; but to effect this change there must be both act and intention. McCrary, Elect. § 62. There must be the act of severance from the old place, with the intention of uniting with the new place. The intention should be gathered from the acts of the party. The acts of Jones were as follows: (1) From his prior home in Iowa he wrote to his friends at Sheridan Lake, Colorado, with reference to locating there. (2) He leased his house in Iowa, terminating his residence there, and left his wife visiting in Kansas, while he proceeded to Sheridan Lake, in Colorado, arriving there on the 6th day of May. (3) On the 7th day of May he bought a lot at Sheridan Lake;

also agreed with the town company to erect on another lot there a building, and put a hardware store thereon, the same to be done within thirty days, upon which the said lot was to be donated to him by the said town company. (4) The erection of a hardware store. (5) The buying of the relinquishment of a claim near by for a home. (6) Going for his family, returning, and continuing to live there with his family. That Jones had terminated his residence in Iowa, and commenced his residence in Colorado, on the 7th day of May, and that such was his intention, is clearly established from the acts enumerated. The fact that he answered, in the cross-examination, that he would not have stayed in Colorado if he had not liked it is of no significance, for it is apparent from his acts that before the 8th day of May he had thought well enough of Colorado to conclude to cast his lot with her people; and all his acts thenceforward verify the fact that such was his intention. It follows that Jones commenced his residence in the state of Colorado on May 7th, and that he was a legal voter at the said election, and that the court erred in deducting his vote from the count.

*Second.* W. A. Laffaty. This voter testified that he resided at Sheridan Lake; was cashier of the Citizens' Bank there; came to Colorado on May 3, 1887; before coming to Colorado resided in Illinois, where he was handling a stock of general merchandise; sold out the business, and left Illinois April 29th and came direct to Colorado. His intention was to become a citizen of Colorado, and had never changed such intention. On May 3d he was at the Railroad House in La Junta, Bent county, Colorado, and consulted with Killgore & Seeley there; was looking up a place of business; went from there to Lamar, Bent county, and went to Sheridan Lake June 15th, and lived there ever since; had no family. When he first went to La Junta, he registered from Illi-

nois; when he went to Lamar, he registered from La Junta; and when he went to Sheridan Lake, did not register at all.

On cross-examination he stated that since May 3d he had no interest in real or personal property outside of Colorado, except notes and accounts at Alexis, Illinois; that he came to Colorado to engage in business; was not certain he would engage in business until he had made up his mind to go into the banking business; did not know that he would have stayed in Colorado if he had found no business that suited him; if he had found business in some other state that suited him better, would have gone there; commenced to build his banking-house July 15th; had been waiting some time for lumber to do the work with. Before deciding to go into the banking business at Sheridan Lake, had not decided what business he would go into, nor in what town.

On re-direct examination he stated that after his arrival at La Junta, May 3d, he did not give the matter of going into any other state or territory any thought or consideration; had no fears or doubts at any time after he first came to La Junta as to being able to find a permanent location in Colorado. Between the time of going to La Junta and the time of locating at Sheridan Lake he resided in Colorado, at the following places: Cheyenne, Wells, Kit Carson, Manitou, Denver and Pueblo; and there is nothing in the evidence contrary to this testimony.

Did this voter's residence in Colorado commence as early as May 8th? The act of changing from Illinois to Colorado was consummated May 3d. That such was the intention is verified by every act thenceforward. This voter had no family. His first residence or domicile in Colorado was at La Junta. While there he had no other. So, too, with the other places he resided at previous to his permanent location at Sheridan Lake in June or July. The domicile or residence in the state may com-

mence before a definite county or precinct is fixed for a permanent residence. Jac. Dom. secs. 133, 134. As to the six-months residence required by statute, if the purpose of remaining in the state be clearly proved, a particular home is not necessary. Whart. Confl. Laws, sec. 58; Story, Confl. Laws, sec. 46. It follows that the said Laffaty commenced his residence in Colorado May 3d, and was a legal voter at the said election in November, and that the court erred in deducting his vote from the count.

*Third.* A. D. Bortle. From the evidence it appears that this voter was located on a pre-emption claim in the precinct where he voted on the 2d or 3d day of May, 1887. That he and his family lived there, and continued to live there at the time of the trial. That he boarded with the witness and with a brother-in-law there, while building his house on his claim; went to meet his family, who had been on their way out to Colorado, and were then at Leoti, Kansas; was gone for his family four or five days. That he and his family moved into the house on the claim during the month of May. That the former home of Bortle was in Missouri. From the testimony of one witness it appears that Bortle's family arrived as early as the 6th day of May; that they stopped at his house on arrival in the precinct. There is nothing in conflict with nor contrary to this evidence, except a slight difference as to the date of the arrival of the family. Bortle was not called to testify, though shown to be within reach of the process of the court. I see nothing to cast a doubt against the sufficiency of Bortle's residence to constitute him a legal voter at the said election. The court erred in deducting his vote from the count.

*Fourth.* Frank J. Barnes. It appears that this voter was registered as residing on section 22, township 26. A witness testified that he did not live on said section as early as the 8th day of May, 1887. Another witness testified that he knew said Barnes, and saw him in the pre-

cinct in September, and that he resided there; and this
is all that is shown of him by the evidence.

*Fifth.* John W. Gwin. It appears that this voter
was registered as residing on section 31, township 37;
and a witness testified that there was no one living there
as early as May 8th. Another witness testified that he
knew the said Gwin, and that he resided in the precinct;
and this is all that is disclosed of him by the evidence.

*Sixth.* Emmet W. Smith. It appears that this voter
was registered as residing on section 33, township 37, and
a witness testified that Smith was not living there as
early as May 8th. Another witness testified that he
knew said Smith, and that he resided in the said pre-
cinct;. and this is all that is disclosed of him by the evi-
dence.

*Seventh.* J. Elzen. There was an ineffectual attempt
to show that this voter did not live on the claim shown
by his registration to be his place of residence.

As to the last four of these seven voters, the evidence
concerning them seems to have been given upon the im-
pression that a residence of six months in the precinct
was necessary. The registration occurring but a short
time previous to the election, the precinct in which the
voter then resided would, of course, appear as his place
of residence, such registration showing simply where he
resided when registered. There is nothing in the evi-
dence touching these four voters to show that they had
not been *bona fide* residents of the state for six months
previous to the said election, as well as residents of the
county and precinct the requisite time. It is certainly
clear that the presumption in favor of the legality of
their votes in this regard is in no way nor to any extent
overcome by the evidence.

*Eighth.* O. H. Perry. From the testimony given by
this voter it appears that he arrived from Chicago, Illi-
nois, at the precinct of Arlington Springs in said county
of Bent, on the 9th day of May; that he had been elected

president of a company there, and came to attend to the business; that he broke up housekeeping when he left Illinois, and had made his home in the precinct from the time of his arrival. His wife was visiting in Rochester, New York. He came to the state to make some money in the real estate business; voted at the said election, but did not know for whom he voted. His politics were the same as the politics of the appellant. On the morning of the election he was presented with the tickets of both parties, and put them in his pocket. On his party ticket which he intended to vote, he scratched the name of the candidate for justice of the peace. He took the ticket from his pocket and voted it, but afterwards found the said scratched ticket in his pocket, and thus discovered that he had not voted the ticket he intended to. What ticket he did vote, or for whom he voted, he knew not. There was no evidence to the contrary. The tickets of this precinct were lost or destroyed, so that it was impossible to ascertain how this voter had voted by the identification of his ticket from the number on the ticket and the number to his name on the poll-lists. The court held the vote illegal, and accordingly deducted one vote from the count for appellant. In so deducting one vote from the count for appellant the court erred, for the reason that there was no evidence to show that the vote had been cast or counted for appellant. See McCrary, Elect. (3d ed.) § 460.

As to the remainder of the twenty-two votes of this class deducted from the count for appellant, I think the evidence sufficient to sustain the findings of the court against a large portion of them, on the question of residence. As to the eight votes deducted from the count for appellee, no question was made as to the court's findings thereon in the argument. However, I think the evidence clearly sufficient to sustain the findings of the court thereon as to all except one, viz., L. H. Herne, of which there may be room for doubt. The evidence does not make it clear as to the

time this voter terminated his residence in Kansas. It appears from his testimony that he was a man with a family, residing in Abilene, Kansas, and was interested in a drug store there; that he came to Colorado May 1st, and looked around a couple of weeks for a location. About the middle of May he went back to Kansas to close out his interest in the drug store there. He did so then and broke up housekeeping there, when the drug store was sold. He returned to Colorado, and his wife went visiting until he could send for her. It does not appear that the act of terminating his residence in Kansas had occurred until after the 8th day of May. He could not have his residence in Colorado while he had one in Kansas. The residence there must terminate before the residence here can commence. The evidence tends to show that he did not terminate his residence there until he sold his drug-store interest there, which was after May 8th. So it does not appear that the court's finding is against the evidence touching this voter.

It follows that appellant had a legal majority of at least two votes; that the said errors of the court below were prejudicial to the appellant, and that the judgment should be reversed.

PER CURIAM. For the reasons stated in the foregoing opinion the judgment of the court below is reversed.

*Reversed.*

HELM, C. J. (*dissenting*). I feel reluctantly constrained to dissent from the views expressed and the conclusion reached by a majority of the court. In so doing I adopt the following opinion, which is almost *verbatim* the one prepared by Commissioner DE FRANCE, concurred in by Commissioner RISING, and reported in this case to the court. I believe it to be the sounder exposition of the statute under consideration.

The manner of voting at elections in this state is by ballot, and the law-making power has at least attempted

to prescribe what kind of a ballot should be used, so far as its material and color, and also its width, if printed, are concerned. Section 1181 requires it to be a "paper ticket," but the color of the paper and the width of the ballot are matters that were left to the choice of the electors or of the respective political parties that usually have the ballots prepared and printed for distribution and use upon election day. With no further provision as to the ballot in this respect than that it should be a "paper ticket," the door was left open for such practice, not to say abuse, as had a tendency to defeat the primary object of the ballot system, namely, its secrecy.

The law thus stood until 1883, when section 1281, in connection with other provisions, was enacted. The purpose of such enactment is not to be doubted. It was to afford the voter a better security for the secrecy of his ballot than then existed. The forty-eight ballots in question in this case were printed ballots, printed on yellow paper. The provisions of this section prohibit the use of any other than plain white news printing paper for printed ballots. The width of the ballot is provided for, allowing some latitude therein. The law prescribes what a lawful ballot shall be, and its essential purpose is to prohibit the use of a ballot which, from its color, width or any device or mark thereon, may be readily distinguished, by its back or in outward appearance, from a lawful ballot. Such a ballot is by this law made an illegal ballot. It is declared unlawful to even print ballots of that kind for distribution at the polls or to distribute the same to the electors. It has been suggested that because the law does not in express terms say that it shall be unlawful to vote the same, nor declare any consequence for so doing, it may be inferred that such act was not intended as one of the things prohibited, and that at all events it was not intended that the voter committing such act should lose his vote. But this cannot be, for if the voting of such ballot is not to be deemed prohibited,

the law is without force or meaning.  The latter clause of the section clearly does away with any such inference by naming certain things as not prohibited, and thus including all others as prohibited which are within the purview of its provisions.  A ballot proscribed as illegal before it is voted is not, when voted, converted into a legal ballot under the provisions of said enactment or of the election laws.  Its character as an illegal thing remains unchanged.  That the voting of such a ballot is prohibited cannot, I think, admit of any doubt.  The consequence of voting an unlawful ballot is fixed by the very nature and tendency of the act.  *Morril v. Haines*, 2 N. H. 246.

The necessary consequence under this statute is that the voter shall lose his vote.  If the law provided a penalty for casting such a ballot, the consequence might perhaps be different, and the vote, in that event, be considered valid, for the reason that no other consequence than that prescribed should be visited upon the voter.  *Morril v. Haines*, 2 N. H. 246; *Lester v. Bank*, 33 Md. 558; *Harris v. Runnels*, 12 How. 79.

But where no express penalty is prescribed, and the nature of the forbidden act is such as carries with it or determines the consequence, then such consequence must attach, and especially when, without attaching it, the legislative enactment would be left without force.  In the case before us, if the consequence — that is, the loss of the vote — be not attached, then the principal object of the law is defeated.  A statute must be so construed and applied as to fully carry out the true intent and meaning thereof.  Sec. 3143, Gen. St. 1883; Sedg. St. & Const. Law, 325.  To place any other construction upon the essential provisions of sec. 1281 — as, for instance, to hold such provisions to be merely directory — would do violence to the enactment, and leave it without force.  "Statutory requisitions are deemed directory only when they relate to some immaterial matter, where a compliance is

a matter of convenience rather than of substance." *People v. Schermerhorn*, 19 Barb. 558.

In the case of *Rex v. Loxdale*, 1 Burrows, 447, Lord Mansfield says: "There is a known distinction between circumstances which are of the essence of a thing required to be done by an act of parliament and clauses merely directory."

Where a statute requires the manner of voting to be by ballot, it is imperative, and votes cast *viva voce* cannot be counted. McCrary, Elect. (2d ed.) § 446. The chief reason for the ballot system is its secrecy, and the chief object of sec. 1281 is to secure such secrecy; and its requirements, being reasonable, should have the like force and effect given to them as are accorded to a statute adopting the ballot system.

As the underlying principle of our government is that the will of the majority shall rule, so the chief object of our election laws is to ascertain what that will is. It is important, therefore, that no legal voter should be deprived of his vote, or lose the same after it is cast; and hence the principle of strict construction is applied, as a general rule, to all election laws, where it can be applied consistently with their provisions, in favor of the innocent voter, that he may not, by the wrong-doing or omissions of others, be deprived of a voice in the conduct of governmental affairs. But we know of no well-considered authority which extends such principle to a case where the voter himself has broken the law. This distinction is well recognized by Brewer, J., in the case of *Gilleland v. Schuyler*, 9 Kan. 569, where he says, at page 591: "The complaint is that the officers have designated an improper place, and not that the electors have assumed to disregard the selection of either the legislature or any officer. Where the electors have not themselves broken the law, ought they to be disfranchised?" And see McCrary, Elect. (2d ed.) § 312, and authorities there cited.

The right to vote is a constitutional right; but no one doubts at this day the power of the legislature to make reasonable rules and regulations to which the exercise of such right shall be subject. Section 1281 is not unreasonable in its provisions, and its requirements may be observed by the voter with little or no inconvenience, and impose no hardship when obeyed. "All devices by which the secrecy of the ballot is destroyed, by means of colored paper used for ballots, or by other similar means, are exceedingly reprehensible, and, whether expressly prohibited by statute or not, should be discountenanced by all good citizens." McCrary, Elect. (2d ed.) § 195.

It is claimed that because the section contains no negative words, as that the proscribed ballot shall not be received, or that it shall not be counted, or the like, it was not intended to invalidate the vote, and that its provisions must be considered directory. But as I have before stated, they amount to nothing if so treated. The judges of election may not, when they come to count the votes, be authorized to refuse the counting of such as are proscribed by this section, if any such be cast, in the absence of a statutory provision to that effect, for they then act in a merely ministerial capacity; but their power, when acting as judges, to reject the same, if offered, is not, I think, to be doubted. If they are not possessed of such power because not expressly given, then, if an elector should offer a wooden ballot, or one of any other material, too large to go into the ballot-box, the judges of election may not reject it, for the same reason. When the matter of such ballots come before a court to be passed upon, the court is not limited to the powers of a mere canvassing board.

But it is by no means a uniform rule, nor even a safe guide, that a statute containing no negative words is to be treated as directory. The nature of its provisions, its language, and the end to be attained, must be looked after. "Affirmative words may, and often do, imply a

negative of what is not affirmed as strongly as if expressed. So also if, by the language used, a thing is limited to be done in a particular form or manner, it includes a negative that it shall not be done otherwise. Affirmative expressions that introduce a new rule imply a negative of all that is not within the purview." *District Tp. v. City of Dubuque*, 7 Iowa, 276. Also 1 Kent, Comm. 467, note *b*.

It is sometimes very convenient to call the requirements of a statute directory. In *Briggs v. Georgia*, 15 Vt. 61, Hebard, J., criticising such practice, says: "I am not very well satisfied with the summary mode of getting rid of a statutory provision, by calling it directory. If one positive requirement and provision of a statute may be avoided in that way, we see no reason why another may not."

The law does not provide the ballot for the voter. It leaves that matter to him, and he therefore has control over it. The preparation and tender of a lawful ballot, except where such tender may be excused, is a condition precedent to the voter's right to have his ballot received. The voter himself may not complain, nor any one for him, if he loses his vote under such circumstances, for it is his own act which brings about the result. In the case of *Kirk v. Rhoades*, 46 Cal. 399, under a statute regulating the size and form of ballots and the kind of paper to be used, it was held that as to those things over which the voter has control the law is mandatory, and as to such things as are not within his control it should be held directory. This case is cited with approval in McCrary, Elect. (2d ed.) section 403. I approve the rule, but would include more things as being under the control of the voter than is done in that case. The voter should equip himself with a proper ballot. The law permits him to use a written or printed ballot. If he neglects to provide himself with a ballot, and relies wholly upon its being furnished him by others on election day

when he desires to vote, he should not be permitted, nor should either party in an election contest be permitted, to excuse a plain violation and disregard of the law by showing that no printed ballots of a lawful character were accessible. The excuse made, that proper ballots had been sent by mail, express or otherwise, directed to some one or more of the voters of the election precinct where the yellow ballots were used, but had failed to reach their destination in time for use on election day, is not a sufficient excuse, if indeed there can be any excuse at all for such conduct. Nor can the fact that there was no such paper available in that precinct at that time as the law prescribes for printing ballots be allowed as an excuse. If the act of voting such a ballot was made a criminal offense, punishable by fine or imprisonment, the penalty of the law could not be evaded by any such excuse. Neither can the consequence attached to the law as it exists be avoided in that way. The matter may not be excused by a showing that no fraud was intended any more than that one who has knowingly and wilfully committed a fraud may defend himself against such act by proof that he did not intend a fraud. The voters in this case openly violated the law, and they did it knowingly, also; for, as before said, they are presumed to know the law. The vote might have been different in that precinct but for the use and circulation of the yellow ballots. We should give such sanction to the law as will uphold it, and as it was evidently intended should be given, and hold that the court below committed no error in its ruling upon this question. The forty-eight yellow ballots were properly rejected as illegal.

I think the matters complained of, as to the return made of the election from Wilde precinct, and as to the return from Las Animas precinct, are but irregularities which could not, under the evidence, be held to invalidate such returns.

In reference to the charges and counter-charges of

votes cast by persons not entitled to vote, I think the court committed some errors in its findings. As there were such illegal votes cast and counted in favor of each of the parties, however, and as the difference therein would not change the result reached by the court below, I do not deem it of sufficient importance to state my views upon the subject by summing up the evidence as to each vote challenged upon that ground.

In my opinion the judgment should be affirmed.

*Reversed.*

### ON PETITION FOR REHEARING.

#### (April 2, 1889.)

PER CURIAM. Upon further examination, we see no occasion to change the views heretofore expressed in the opinion of Commissioner STALLCUP. See *State v. Wolf*, 20 Pac. Rep. 316 *et seq.*, reviewing *State v. McKinnon*, 8 Or. 494. The petition for a rehearing is denied.

*Denied.*

HELM, C. J., dissenting.