[No. 7194.]

## The People v. Turpin et al.

1. **Residence—How Acquired**—Residence is not acquired by mere intention. The purchase, by a citizen of another state, of a plantation in Colorado, with a bona fide purpose to remove thereto, and make it his home, as soon as possession thereof can be acquired, he in the meantime retaining his former home, does not constitute him a resident of this state, though he afterwards, pursuing his original purpose, removes to this state and establishes himself here. His residence and his capacity as an elector relates to the day of his actual settlement in Colorado, and not to the day when he formed the purpose.— (236-239)

2. Cases Overruled, Distinguished or Explained—Kellogg v. Hickman, 12 Colo. 256, distinguished.—(239, 240)

3. Evidence—Admissibility—Secrecy of the Ballot—Where the result of an election is in question and the law provides no means by which the ballot of any voter can be identified, one who is shown to have voted, not being a qualified elector, may be required to testify as to how he voted; and other evidence upon the point is admissible.—(243, 244)

*Error to Mesa District Court*—Hon. SPRIGG SHACKLEFORD, Judge.

Mr. R. M. LOGAN, district attorney, Messrs. WHEELER & WEISER, and Mr. R. D. THOMPSON for the people.

Mr. STROUD M. LOGAN, Mr. N. C. MILLER, and Mr. HENRY J. HERSEY for defendants in error.

Mr. JUSTICE HILL delivered the opinion of the court:

This action was brought under section 289 of Mills' Annotated Code to determine the right of the defendants in error to hold certain offices, the existence of which depends upon the validity of an election for the consolidation of certain school districts in Mesa county. Elections were held in three school districts under an act of the legislature approved May 5, 1909, entitled, "For the consolidation of adjoining school districts," etc. This proceeding pertains, in part, to the election upon this question in District No. 32, known as Pomona School District, in Mesa county, in which the judges of election canvassed the votes and declared that sixty-two had been cast for, and that sixty had been cast against, such consolidation. After the results of these elections were announced (all of which were for consolidation), the defendants in error, at their union meeting (called as provided for by the act), were elected as the president, secretary, and treasurer, of the consoli-

dated district to be known as District No. 38, and they entered upon their duties as such.

The prayer of the complaint is, that judgment be entered decreeing that the defendants, and each of them, are unlawfully and illegally usurping the office of school directors of said consolidated School District No. 38, and that they and each of them be ousted therefrom, and ordered to desist from further attempting to exercise such offices; that the organization of the so-called consolidated school district be declared illegal; that the defendants be enjoined from further acting as a school board for said so-called School District No. 38, etc. Among other reasons alleged why this prayer should be granted is the claim that at said election in District No. 32 there were five illegal votes or ballots cast, received and counted for consolidation, which were included in the sixty-two votes declared by the judges to have been cast in favor of consolidation; that a majority of said qualified electors of said school district did not cast their ballots for consolidation; that it did not carry at said election by a majority of the votes cast, etc.; that on account thereof said consolidated School District No. 38 had not been organized and created according to law, etc.

The answer denied in detail the allegations concerning the illegal votes. Trial was to the court. At the conclusion of plaintiff's testimony, a motion for a nonsuit was granted, and the case dismissed.

Numerous errors have been assigned; we will only consider those pertaining to the validity of the votes cast by a Mr. and Mrs. Wooliston, as the court's ruling thereon will necessitate a reversal of the judgment.

This election was held upon November 16, 1909. The substance of the Woolistons' testimony, given at the trial (upon May 5, 1910), is to the

effect that they moved from Phillips, Nebraska, to a fruit farm in this school district, between the 7th and 10th of March, 1909, when they shipped their household goods and other effects from Nebraska to Grand Junction, and at once moved them out to this place. Until they moved their effects direct to Grand Junction in March, 1909, they had not lived at any other place in this state, but had lived at Phillips, Nebraska.

Upon cross-examination it was shown that they first came to Colorado in August, 1908, stopped in Denver a few days; from there went to Colorado Springs; thence to Grand Junction, where they stayed four or five days, during which period they bought this farm. It being occupied, they did not get possession of it at that time, and after their four or five days' sojourn at Grand Junction, they returned to their home in Nebraska, where they continued to reside between six and seven months. In cross-examination it was shown that prior to coming here in August, 1908, they had decided to locate in Colorado in the future, and came here in August, 1908, for the purpose of looking up a location; with that object in view they, at that time, purchased this farm in the Pomona District, for the purpose of making it their future home; but they both testified, that after this purchase they went back to Nebraska, and lived there until they came here in March, 1909; that at the time of the purchase of the farm they left no personal effects in Colorado. Mr. Wooliston was asked, "Did you live in Phillips, Nebraska, until you moved direct to Grand Junction in March, 1909?" He answered, "Yes, sir; I did." Referring to this question he was further asked, "Had you lived in Colorado previous to coming here at that time; had you resided in Colorado previous to moving here in March?" His answer was, "No, sir; I

had lived in Nebraska, but I had intended to buy here; I had come out here and bought a place in August before.'' Upon cross-examination he stated he bought this place to make it his home, and that when he bought it he did elect to make that his home; that at that time he had no home except his rented home in Nebraska. Upon re-direct examination he stated that he first made his home here about the 7th of March; that he did not become a resident here until 1909, but that he had the place and was intending to come here; that between the date of the purchase in August, 1908, and March, 1909, he resided back in Nebraska, and that he did not reside here until he moved here in March, 1909. He further stated that after his purchase here, his purpose in returning to Nebraska was to prepare to return to Colorado.

Upon the question of intention, in response to the question, ''Had you been advised by any one that you was a qualified voter at that election?'' Mrs. Wooliston answered, ''I was given the impression by people whom I thought knew; I had never read up on the state law of Colorado, but it was my impression that had we had the intention of residing in the state for a year, that we were entitled to vote at a school election at any rate.'' From this undisputed testimony, we conclude that Mr. and Mrs. Wooliston, who were husband and wife, did not become residents of this state until they moved here (in March, 1909) for the purpose of making this their permanent home, for which reasons at the time of the election they had not resided within the state a year, as required by our constitution.

In the case of *Jain v. Bossen,* 27 Colo. 427, this court said: ''The requirements of the law on the qualification of electors are mandatory, and must be strictly observed.''

All the authorities point to the fact that to effect

a change of residence from one state to another, there must be an actual removal; an actual change of domicile, and a *bona fide* intention of abandoning the former place of residence, and establishing a new one, and the acts of the parties must correspond with such purpose. This intention of the parties to, at that time, make the state they removed to the place of their permanent residence is to be gathered from their acts, declarations, and from a variety of other circumstances. If a citizen of one state, in good faith, gives up his residence there, goes to another state, and takes up a permanent residence therein, he at once loses his former residence and acquires a residence in the new domicile; but it must appear that he has left the former state with the intention of then giving up his residence there.

In the case of *Sharp v. McIntire*, 23 Colo. 99, referring to the construction to be given the residence qualification provided by our constitution, as it then read, this court said:

"We think the residence therein contemplated is synonymous with 'home' or 'domicile,' and means an actual settlement within the state, and its adoption as a fixed and permanent habitation; and requires not only a personal presence for the requisite time, but a concurrence therewith of an intention to make the place of inhabitancy the true home; and that one who has made a home or domicile in some other state or territory where his family reside, can not, by a sojourn here on business or pleasure, however long, without abandoning such former domicile, acquire a residence in the constitutional and statutory sense."

It is earnestly urged by the defendants in error that the facts pertaining to the voters Jones and Laffaty in the case of *Kellogg v. Hickman*, 12 Colo. 256, are similar to those here, and hence that case is

decisive of this one. We cannot agree with this contention. Pertaining to the voter Jones, the court said:

"The domicile or residence, in a legal sense, is determined by the intention of the party. He cannot have two domiciles at the same time. When he acquires the new home, he loses the old one; but to effect this change there must be both act and intention. * * * There must be the act of severance from the old place, with the intention of uniting with the new place. The intention should be gathered from the acts of the party."

Referring to the voter Laffaty, the court said:

"The act of changing from Illinois to Colorado was consummated May 3rd. That such was the intention is verified by every act thenceforward. This voter had no family."

Referring to which it was further stated:

"The domicile or residence in the state may commence before a definite county or precinct is fixed for a permanent residence. * * * As to the six-months residence required by statute, if the purpose of remaining in the state be clearly proved, a particular home is not necessary."

In the case under consideration the particular home to be secured in the future was decided upon; it was purchased in August, 1908, but it was understood that possession could not be secured at that time. 'Tis true, these people intended to make it their home in the future; to establish their residence there at a later period. The fact was then settled in their minds as to where their home in Colorado would be when it became established, to-wit, when they gave up their home in Nebraska and located here; this could not be done so long as they were maintaining a home in Nebraska, which they had not yet abandoned. Neither the intent nor the act

of doing so was perfected, because the intent in
this case referred to a future date, and the physical
act itself was not accomplished until some future
date; so that the facts urged in the case of *Kellogg
v. Hickman, supra,* are not applicable here. This
is further demonstrated by the questions asked both
Mr. and Mrs. Wooliston as to when they did estab-
lish their residence in Colorado, and as to when
they moved here, to both of which they frankly
answered, in March, 1909.

The facts pertaining to the voter Herne, in the
case of *Kellogg v. Hickman, supra,* are more in
harmony with the facts here. In speaking of this,
the court said:

"The evidence does not make it clear as to the
time this voter terminated his residence in Kansas.
It appears from his testimony that he was a man
with a family, residing in Abilene, Kansas, and was
interested in a drug store there; that he came to
Colorado May 1st, and looked around a couple of
weeks for a location. About the middle of May he
went back to Kansas to close out his interest in the
drug store there. He did so then and broke up
housekeeping there when the drug store was sold.
He returned to Colorado, and his wife went visiting
until he could send for her. It does not appear that
the act of terminating his residence in Kansas had
occurred until after the 8th day of May. He could
not have his residence in Colorado while he had
one in Kansas. The residence there must terminate
before the residence here can commence. The evi-
dence tends to show that he did not terminate his
residence there until he sold his drug-store interest
there, which was after May 8th."

It stands undisputed that at the time the Wool-
istons first came to Colorado they had not aban-
doned their residence in Nebraska, and after staying

(16)

here but a few days, while making the purchase of the farm, they again returned to the state of Nebraska, where they continued to occupy their home there for a period of about seven months, at the expiration of which time they abandoned it, shipped their goods to Colorado, and came themselves, which was in March, 1909, when they moved out upon this property; at which time, and not before, both the act and intent were consummated by which they became residents of the precinct, as well as of the state.

When one has a residence either of origin or of choice, he must abandon it before he can acquire another, and to effect this there must be both act and intention; there must be the act of severance from the old place with the intention of uniting with the new place, and these must concur.—Vol. 10, Am. & Eng. Enc. of Law (2nd ed.), p. 599.

The abandonment of the old residence must be actual. The mere intention to change the domicile, unaccompanied by an actual removal, avails nothing. —*State v. Hallett,* 8 Ala. 159; *Smith v. Croom,* 7 Fla. 81.

A very recent case where the facts were similar to those under consideration is that of *Welch v. Shumway,* 232 Ill. 54, where numerous cases are cited, all of which are in harmony with our conclusions here.

The case of *State v. Hallett, supra,* is directly in point; at page 161, in speaking to this point, the court said:

"Here the facts were, that the defendant, being domiciled in Georgia, came to this state, with the design of settling here, and manifested his intention of making this state his permanent residence by leasing a piece of land, procuring materials for the erection of a foundry, and going to Georgia to bring

his family. These acts all mark, unequivocally, his intention to change his residence from Georgia to this state. These facts, however, are not sufficient to cause a loss of the domicile he previously had. If, on his return to Georgia, he had died before being able to carry his purpose into effect, it can admit of no doubt the courts of Georgia, and not of this state, would have been entitled to distribute his estate.''

The above conclusions are applicable here. In case Mr. Wooliston, after returning to his home in Nebraska, had changed his mind and decided that he would not return to Colorado, would any one have questioned his right to vote there? Likewise, had he died before returning, the courts of Nebraska, and not of this state, would have been entitled to distribute his personal estate.

The evidence having established that Mr. and Mrs. Wooliston were not entitled to vote, it follows that the trial court misconceived the legal effect of their testimony, and erred in not requiring them to answer how they voted. By our present system of voting at general elections under what is commonly called the Australian ballot system, in cases of this kind, the ballots cast by these voters could have been secured, identified and rejected; but as our school laws do not so provide, and the evidence showing that no record was kept by which any ballots cast at this election could be identified, the testimony of the voter was then competent. The law protecting the secrecy of the ballot is only intended for lawful voters and does not apply to or protect illegal voters, who, when that fact is shown, can be forced to testify as to how they voted. — Art. 7, § 9, Constitution of Colorado; *Black v. Pate,* 130 Ala. 514; *Montgomery v. Dormer,* 181 Mo. 5; *Van Winkle v. Crabtree,* 34 Ore. 462; *Vallier v. Brakke,* 7 S. D. 343;

*State ex rel. v. Kraft,* 18 Ore. 550; *Lane v. Bailey,* 29 Mont. 548.

It is true, if it is not shown that the vote was illegal, the voter cannot be compelled to answer how he voted; but if illegal, in addition to compelling him to answer, other evidence may be received and considered on the subject.—*Black v. Pate,* 130 Ala. 514; *Rexroth v. Schein,* 206 Ill. 80; *Welch v. Shumway,* 232 Ill. 85; *Sorenson v. Sorenson,* 189 Ill. 179; *People ex rel. v. Pease,* 27 N. Y. 45; *People ex rel. v. Teague,* 106 N. C. 576.

Other errors are assigned, some pertain to the validity of other votes, others urge constitutional questions, while others pertain to the regularity of this election in other respects, etc.; but inasmuch as the ruling upon the two votes heretofore considered compels a reversal of the judgment, and, if they were cast as counsel claim they were, and the way the record as a whole appears to indicate, it makes unnecessary the consideration of any of the other questions urged.

For the reasons stated the judgment is reversed and the cause remanded.

Decision *en banc.    Reversed and remanded.*