WM. P. OWENS v. THE STATE EX REL. R. C. JENNETT.

(Case No. 1870.)

1. ELECTION — OFFICE — EVIDENCE.— In a contest involving the right to an office, when the official returns are attacked as not showing the true result of an election, held:

(1) The ballots are *prima facie* evidence of the result of the election.

(2) In a proper case the ballot-boxes may be opened and the tickets counted to rebut the presumption in favor of the returns; but in case of disagreement between the returns and the ballots, the latter must prevail, as the best evidence of the will of voters.

(3) In order to allow the ballots to prevail as against the returns, it must appear that they have been preserved by the proper officers as required by law, and have not been exposed to the reach of unauthorized persons, so as to afford reasonable probability of having been changed or tampered with. Following Hudson v. Solomon, 19 Kans., 177; People v. Livingston, 79 N. Y., 279, and State v. Owens, 63 Tex., 261.

2. SAME.— Hence, on the trial of the right to an office, it is proper for the jury to base their estimate of the result of an election on the official returns, when satisfied by evidence that the ballot-boxes have been tampered with, after the official count, and by the ballots, when there is no satisfactory evidence of such interference with the ballot-box.

3. JURY TRIAL.— When, during the progress of a trial, bystanders greet with applause whatever is favorable to some one of the litigants, and this conduct continues from time to time unchecked until the trial is concluded, and the verdict is in favor of the party for whom such sympathy was shown, the judgment rendered on such a verdict will be reversed, if from the whole case it appears that the verdict may have been influenced by such demonstrations. Such conduct by bystanders is a contempt of court of the most serious character, tending, as it does, to pervert the course of justice, and should be suppressed, if need be, by the strong arm of the law; if that be inadequate, then the trial of the cause should be stopped until a fair trial can be had.

4. SAME.— When, on the trial of a cause involving the right to an office, the jury manifestly based their verdict on the official returns from one ward-box of a city, and excluded another, when the propriety of recognizing either depended on substantially the same testimony before them, and the verdict was in favor of the party for whom bystanders showed their sympathy by applause from time to time during the trial, held, that no matter how conscientious the jury may have endeavored to act, the fact that they may have been influenced by such conduct of bystanders required a reversal of the judgment based on such a verdict.

5. ELECTION — EVIDENCE — PLEADING.— In a contest for an office, a charge that the ballots cast at an election were not fairly and correctly counted, tallied and returned, is determined by an inspection of the ballots themselves, and comparing them with the returns, and does not authorize evidence that a ballot found in the box was not actually voted. It may be shown, under such a state of pleading, that an elector voted for a different candidate from one whose name appeared on his ballot, in order to show that the ballot had been tampered with, but the jury should be instructed that the evidence was not admissible to contradict the ballot.

6. SAME.— When the issue was whether the votes cast at an election were fairly and correctly counted, tallied and returned, if the jury should find that the ballot-boxes had not been tampered with after the returns were made, but before, then they should base their verdict on a count of the genuine votes in the boxes and by giving to the party defrauded the votes of which he had been deprived by such unauthorized alterations.

7. ELECTION TICKETS — STATUTE CONSTRUED.— The prohibition in the statute against using any ticket at a popular election on which appears a picture, sign, vignette stamp, mark or device, is not violated by printing on such tickets, voted at a general election at which presidential electors are chosen, the names of popular candidates for president and vice-president, and the counties in which presidential electors reside.

8. CONSTRUCTION OF STATUTES.— All statutes tending to limit the exercise of the elective franchise by the citizen should be liberally construed in his favor; and unless a ticket comes within the letter of the prohibition against a particular kind of ticket, it should be counted, if the party is entitled to vote.

9. ELECTION — EVIDENCE.— A party to a suit involving the right to an office may, under proper allegations, show by the testimony of a voter that the ballot accredited to him does not reveal the truth as to his vote, but that he voted for one whose name does not appear on his ticket. But a charge of fraud or error in the count alone does not authorize the vote, as it appears, to be set aside, and the vote as actually cast counted.

APPEAL from Galveston. Tried below before the Hon. W. H. Stewart.

The facts, so far as necessary to an understanding of the case to which the principles announced apply, will be found, in the main, contained in the opinion. The litigants were rival candidates for the office of sheriff of Galveston county at the general election of November 4, 1884. The official returns showed that Owens received 2,025 and Jennett 1,985 votes for sheriff at that election. Jennett charged in effect that the ballots cast at certain wards were falsely and fraudulently counted, tallied and returned, to his prejudice, etc.

Answer, denial, and that errors and mistakes in respect to the manner of counting the ballots were made against respondent in certain precincts named. Also, that a large number of illegal ballots were cast and counted for relator; ballots containing other matter printed thereon than allowed by statute and in violation of the same, as referred to in the opinion.

Relator excepted to this answer, and the court sustained the exception to all that matter of defense predicated on illegal votes cast, as shown by exhibits. Respondent then filed a trial answer.

Verdict and judgment for the relator for the office.

*Wheeler & Rhodes*, for appellant, cited: Cooley on Const. Lim. (4th ed.), 770 [*612]; McCrary, sec. 440, p. 373. On the illegality of the ballots, because they exhibited printed thereon the candidates' names for president and vice-president, they cited: Art. XII (amendment), Const. of U. S.; 1 Kent's Comm. (3d ed.), p. 293 (275).

*McLamore & Campbell*, also for appellant, on the proposition that the court erred in permitting the ballots to be counted as against the returns of election, under the circumstances showing that the ballot-boxes had been tampered with as referred to in the opinion, cited: Arts. 1317, 1702, R. S.; the opinion on former appeal of this

case; McCrary on Elections, secs. 277, 288, 366; Hudson v. Solomon, 19 Kan., 186; Cooley on Const. Lim., p. 625; Howerton v. Holt, 23 Tex., 60, 61; T. & P. R. Co. v. Murphy, 46 Tex., 366, 367; and Heldt v. Webster, 60 Tex., 209.

*Finley & Rose*, for appellee, that the evidence was admissible to show that the ballots were not the genuine ballots of the voters, as deposited by them, cited: Jennett v. Owens, Galveston Term, 1885; People v. Thatcher, 55 N. Y., 525; 14 Am. Rep., 320; People v. Pease, 27 N. Y., 45; Newton v. Newell, 26 Minn., 529; 6 N. W. Rep., 346; Hudson v. Solomon, 19 Kans., 177.

That the charge of the court was correct, they cited: People v. Thatcher, 55 N. Y., 525; 14 Am. Rep., 320; People v. Pease, 27 N. Y., 45; Newton v. Newell, 26 Minn., 529; 6 N. W. Rep., 346; City of Galveston v. Morton, 58 Tex., 415; Merriwether v. Dixon, 28 Tex., 19.

That the unnecessary matter printed on the ballots did not invalidate them, they cited: McCrary on Elec., par. 403, 404, 405, and authorities cited; Kirk v. Rhoads, 46 Cal., 398; Texas General Laws 1879, p. 120; Druliner v. State, 29 Ind., 308; Napier v. Mahow, 35 Ind., 275; Wyman v. Leomon, 51 Cal., 273.

That the court committed no error in permitting voters to testify concerning their ballots, they cited: People v. Thatcher, 55 N. Y., 525; 14 Am. Rep., 320; People v. Pease, 27 N. Y., 45; Newton v. Newell, 26 Minn., 529; Jennett v. Owens, Galveston Term, 1885; Hudson v. Solomon, 19 Kans., 177; McKinney v. O'Connor, 26 Tex., 5.

Willie, Chief Justice.—Upon a former appeal taken in this case by the relator we held that he had the right, under the allegations of his pleadings, to controvert the returns of the election for sheriff of Galveston county, alleged by him to have been fraudulently made, and to show the true state of the vote by the ballots themselves. State ex rel. Jennett v. Owens, 63 Tex., 261. The court below having denied him this privilege, its judgment was reversed and the cause remanded; and a trial was had which resulted in a judgment for the relator. The issues upon which the parties went to the jury, so far as it is necessary to state them for the purposes of the present appeal, were briefly as follows: The relator rested his case upon his charges of fraud in the conduct and returns of the polls of the Eleventh, Twelfth and Fifth wards of the city of Galveston; the defendants, denying these allegations, charged errors and mistakes

in the First, Second, Third, Fourth, Seventh, Eighth, Ninth and Tenth wards.

Each party alleged the difference between the returns and the true state of the ballot, showing the loss that he sustained in each of these wards by the improper count and return of the presiding officer.

The result of the trial was a verdict and judgment for the relator, from which judgment the defendant takes this appeal.

During the progress of the trial, the official returns of all the precincts of Galveston county were counted; and the ballot-boxes of the twelve precincts in the city of Galveston were opened, and the tickets found in them were also estimated, so far as the vote for sheriff was concerned.

According to the official returns, Owens was elected by forty votes; and, according to the ballots found in the city boxes, taken in connection with the official returns from the country precincts, he was elected by twenty-nine votes. It is clear, therefore, that the jury could not have found their verdict upon either of the above methods of ascertaining the ballots cast for the respective parties. They must have reached their verdict, under the evidence, by counting for Jennett the ballots of persons who testified that they had voted for Jennett, but that his name had been erased from their tickets, or they must have taken into their estimate the official returns of some of the precincts, and their own count of the ballots found in the other boxes.

It is claimed by the appellee's counsel that they pursued the latter course, and adopted the official returns of the Third, Sixth, Seventh and Twelfth wards of the city, and their own estimate by actual count of the ballots found in the other city boxes. This would give Jennett a majority of one hundred and thirty-nine votes, and the finding of the jury must be sustained, if sanctioned by the evidence and the charge of the court.

The sole ground upon which it is contended that the official returns of the Third, Sixth, Seventh and Twelfth wards must be corrected is, that the proof shows that they were tampered with between the time the votes were counted and the poll lists made up, and the time when they were offered in evidence. It is claimed that the ballots themselves must prevail as against the official returns in the Eleventh ward, because there was no proof, to the satisfaction of the jury, that there was any tampering so far as that box was concerned.

We consider the following principles well settled: 1. That the

returns are *prima facie* evidence of the result of an election. 2. That in a proper case the ballot-boxes may be opened and the tickets counted to rebut the presumption in favor of the returns; and in case of a disagreement between the returns and the ballots, the latter must prevail as the best evidence of the will of voters. 3. That in order to allow the ballots to prevail as against the returns, it must appear that they have been preserved by the proper officers as required by law, and have not been exposed to the reach of unauthorized persons so as to afford a reasonable probability of having been changed or tampered with. Hudson *v.* Solomon, 19 Kans., 177; People *v.* Livingston, 79 N. Y., 279; State *v.* Owens, 63 Tex., 261.

Hence it was proper for the jury to estimate by the returns, when the proof showed that the boxes had been tampered with after the vote had been finally counted, and by the ballots when there was no satisfactory proof to this effect.

The proof as to tampering with the returns is in most respects substantially the same as to the Third, Sixth, Seventh and Twelfth boxes, which are those in which it is claimed the official returns were received as evidence by the jury. This proof is briefly as follows: The presiding officers stated that when the count was finished they tied tape around the boxes and sealed them with wax; when produced before the jury the seal was preserved but the tape was gone. They testified that they placed copies of the poll and tally lists in the boxes with the ballots, but when opened these lists were not to be found in the boxes. Some of these boxes were kept in the houses of these presiding officers between the time they were sealed up and the time they were delivered to the county clerk; some were left under beds, and one in a wardrobe during the absence from home of the officer. After coming to the hands of the clerk they were placed in one of the rooms of his office for a few days and then transferred to the vault for safe keeping. Whilst in the office they seem to have been protected by the presence of one of the deputies in the day-time, and at night by locks and fastenings to the doors and windows.

The clerk said they showed no signs of being tampered with whilst in this room of his office. He seems to have guarded them against interference whilst in the vault by keeping all the keys of the vault in the possession of himself and deputies, with the exception of one, which was for a short time kept by the janitor. When the boxes were opened there were found in some of them tickets from which the names of all the candidates for sheriff had been

scratched, and some from which none of these names had been erased. The officers presiding over these boxes testified that either none or a smaller number of such tickets than appeared in the box were there when the ballots were counted. Some of the voters to whom these tickets were accredited on the poll list testified that they were not in the same condition as when deposited in the ballot-box by them. Other persons who had voted at one or the other of these four boxes swear that their tickets were not, in other respects, the same as when they made them out and voted. The officers of the election generally stated that it was fairly conducted. This is substantially the evidence upon which it is claimed the jury gave, in the above four wards, a preference to the returns over the ballots themselves.

As to the box of the eleventh precinct, in which, it is claimed, the jury counted the ballots and not the returns, the evidence of tampering is about the same. It was shown that the box was sealed with wax and tied with tape. When presented to the jury no tape was found, and the impress upon the seal was different from that placed there by the officers. Two of the judges of the election stated that a poll and tally list was put in the box before it was sealed. It is true that the other judge stated to the contrary; but a similar conflict occurred between the testimony of a judge and a clerk of the Third ward. The jury found neither poll nor tally list in the box. The presiding officer kept the box for a long time under his bed at home, and during a large portion of that time he himself was absent. When he sealed the box he wrote his name upon a piece of paper and pasted it over the entrance to the box. His name, when exhibited at the trial, appeared to him in some respects different from his signature as always written by himself. The box itself could not be identified by the officers as the same in appearance with that delivered to the county clerk. It had been kept in the clerk's office and the vault in the same manner as the other boxes. Upon opening it and calling witnesses to identify their ballots, it was shown by each of eight different voters at the box that the ticket accredited to him by the poll lists was not in all respects the ticket deposited in the box as his vote. In some the vote for district attorney, in others that for treasurer, in another that for tax collector, in another that for senator, in another that for district clerk, and in another that for sheriff, appeared to have been altered. The only difference in the proof as to the tampering with this box and the others, consisted in the fact that no tickets in the Eleventh ward box were shown to contain the names of all the

candidates for sheriff upon them, nor were there any from which the names of all these candidates had been erased. The alterations in the other boxes were made by changing the vote for sheriff, whereas, in the Eleventh box, but one vote with this alteration was shown, whilst the most of them were changed as to other officers.

On the other hand, the strong proof of tampering, afforded by the change made in the impress upon the wax, which was introduced as to the Eleventh ward box, was not shown in reference to the box of either the Third, Sixth, Seventh or Twelfth ward.

The question submitted to the jury by the charge was: Have any of the boxes been tampered with by any alteration of the votes originally deposited in them? If so, they were directed to count the official returns of that box. The opportunities to alter the ballots in the Eleventh ward box were as favorable as in the case of any of the wards. Alterations did take place. It matters not that they were, in some respects, of a different character. They as fully showed the presence of an unauthorized person; that the ballot-box had been befouled by the touch of impure hands, and could not be relied on as evidence of the will of the citizens of the Eleventh ward. Nor is it important that several of the voters of this ward found their tickets unchanged. The same thing was proved as to other wards. This fact could doubtless have been shown as to a large number of voters at each box, as the person who tampered with the votes would hardly have found it necessary to change every ballot in a box to effect his object. As almost identically the same proof as to tampering was made in reference to the five boxes we have been considering, we are at a loss to determine how it was possible for the jury to find differently as to the Eleventh from what it did as to the other four boxes. This leads us to consider other circumstances, besides those developed in evidence, which occurred during the trial.

It was shown that a large number of persons attended the trial during the whole time that it was in progress. That whenever anything favorable to the relator occurred they greeted it with bursts of applause. That the court checked these demonstrations from time to time, but they were renewed as often as similar occasions called them forth, and they do not seem to have been effectually and finally quelled till the trial was over. It is a sad, if not a humiliating, thought that such unbecoming conduct in a court of justice could not have been effectually and permanently stopped upon its first demonstration. The district courts are armed with full power to punish contempts. This was a contempt of court of the most serious

---

---

character, calculated as it was to control the verdict of the jury by outside influences.   The court would have been justified in using the strong arm of the law to suppress this conduct; or, if these failed, in stopping the trial of the cause until it was fully assured there would be no further demonstrations of the kind.   As this was not done, there is nothing left for us but to apply the rule universally enforced in this court when the jury may have been influenced in giving an incorrect verdict by passion or prejudice caused by the misconduct of others.   We have, in such cases, constantly reversed the judgment and ordered a new trial.   This is a proper case for the enforcement of that rule.

The applause may not have influenced the jury, and perhaps did not, but as it had a tendency so to do, and the jury have admitted one box and excluded others upon substantially the same testimony, there is a probability that their finding may have been affected in some measure by the applause, however conscientiously they may have attempted to act, in making up their verdict.   C. T. & N. W. R'y Co. v. Hancock, Austin Term, 1885.

But it may be that the jury arrived at their verdict by a different process.   They may have counted the tickets shown to have been genuine, and have given to Jennett all such ballots as were proved to have been originally cast for him, and to have been altered after they were deposited in the box.   If they did this they were still in error.   There is no doubt of the right of a party to a contest for office to show by the testimony of a voter that the ballot accredited to him does not speak the truth as to his vote; but that he voted for persons other and different from those whose names appear upon his ticket.   This seems to be generally conceded where the voter is willing to give the testimony, and there is no question of that kind in the present case.   People v. Pease, 27 N. Y., 45; State v. Olin, 23 Wis., 309; People v. Cicott, 16 Mich., 283; 23 Wis., 422.

But to authorize the introduction of such testimony there should be allegations corresponding with the proof offered.   A charge that the ballots were not fairly and correctly counted, tallied and returned would not admit of the testimony.   That charge raises a question as between the returns and the ballots actually found in the box.   This question is determined by an inspection of the ballots themselves, and comparing them with the returns.   The officers of the election count the ballots as they find them in the box.   They are not authorized to call up a voter, and take his statement to show that he voted differently from what his ticket shows, and count his vote according to his statement and in opposition to the ticket.   A

charge of fraud or error in the count does not therefore reach the case of a ballot not actually voted, and authorize it to be set aside, and the true vote counted.

When the relator offered to prove that certain persons voting at precincts 3, 6, 7 and 12 had voted for different candidates from those whose names appeared upon their tickets, the defendant objected to their introduction either for the purpose of contradicting the ballots or for showing that they had been tampered with. The court properly overruled the objection, as they were admissible for the latter purpose; but he should have stated to the jury that they could not be received under the pleadings to contradict the ballot. The charge did not cure this omission. If the jury had concluded that the boxes had *not* been tampered with *after* the returns were made, but *before*, if at all, then they would have found their verdict by counting the genuine votes in the boxes, and also by estimating for Jennett those of which he had been deprived by the alterations.

This finding would have been unauthorized by the pleadings, and as it most probably occurred if the jury did not arrive at their verdict as we have just indicated, their finding cannot be supported under the evidence in the cause.

The amended answer of defendant sets up that many of the ballots cast for Jennett were illegal, some because they were headed *election ticket;* others because the names of the candidates for president and vice-president, and the counties where the presidential electors resided, were printed upon them. The court sustained a demurrer to that portion of the answer, and this ruling is made the subject of an assignment of error. We do not think that these tickets come within the prohibition of our statute. The words printed upon the tickets are neither a picture, sign, vignette or stamp mark, nor are they, properly speaking, a device. By that word the statute evidently intended some figure, mark, ornament, emblem or cipher, which would distinguish the ticket from other tickets cast in the election. It intended to secure the secrecy of the ballot, and to preserve the voter from undue influence or restraint in exercising the right of suffrage. All statutes tending to limit the citizen in his exercise of this right should be liberally construed in his favor.

Unless the ticket comes within the letter of the prohibition it should be counted. We do not feel disposed to extend the meaning of the word *device* beyond its literal signification. This will not include the residences of the candidates, for that may be stated for their better identification. It will not include the names of the candidates for president and vice-president, for they are indirectly sup-

ported by voting for the electors. The words *election ticket*, printed on the inside, folded as the ballots usually are, furnishes no means of distinguishing the ballot from others in the box. It is a mere description of what follows; and as it would be lawful, under the strict letter of the statute, to place the words "Republican Ticket" or "Democratic Ticket," upon the votes, we cannot see how the spirit of the law can be violated by the mere change of one word in the heading of the ballot. See State *ex rel.* Williams *v.* Phillips, 63 Tex., 390.

But the judgment is reversed on the following grounds: 1. Because, if the jury counted the ballots in the Eleventh ward, and the returns in the Third, Sixth, Seventh and Twelfth wards, as contended by the appellee, they came to inconsistent and contradictory conclusions upon substantially the same state of facts; and, as improper influences were shown to have existed which may have contributed to bring about such a verdict, it must be set aside and a new trial awarded. 2. If the jury counted the genuine ballots in the different boxes, giving them to the various candidates for whom they were cast, and gave also to Jennett those which he had lost by reason of their having been tampered with after they were polled, they found upon a state of facts not warranted by the pleadings.

Had the jury found a special verdict upon the various issues submitted by the parties, the determination of the case here would have been greatly simplified. The judgment is reversed and the cause remanded.

REVERSED AND REMANDED.

[Opinion delivered October 20, 1885.]