**Clyde B. KENNELLY, Appellant,**

v.

**Josh GATES, Appellee.**

No. 14950.

Court of Civil Appeals of Texas.

Houston.

Sept. 15, 1966.

Briscoe, Dally & Shaffer, Frank Briscoe, Carl E. F. Dally, Joe C. Shaffer, Houston, for appellant.

Wellborn, Britt & Kelly, Charles W. Britt, Alvin, for appellee.

WERLEIN, Justice.

This suit was brought by appellee, Josh Gates, against Clyde B. Kennelly, to con-test the election of appellant who was certified as the nominee for the position of County Judge of Ft. Bend County, Texas, following the Democratic Primary Run-off election on June 4, 1966. Appellant was certified to have received 3255 votes, and appellee 3245 votes. Both parties in open court joined in a motion asking the trial court to open the ballot boxes and recount and retally the votes. Pursuant to such request the court did in open court have the boxes opened and a recount was made. The court found that appellee had received 3261 votes and that appellant had received 3255 votes. Based upon this finding the court on June 28, 1966 entered judgment for appellee and ordered that his name be properly posted as the nominee of the Democratic Party for the office of County Judge for Ft. Bend County, Texas, and that the county clerk and such other election officials, if any, place his name on the official ballot to be used in the General Election to be held in Ft. Bend County in November, 1966.

In his judgment the court recited that the court heard the pleadings, motions, stipulation and the evidence and argument of counsel and after both sides had rested their case and completed their evidence and argument, found that in the Democratic Primary Run-off election of June 4, 1966, between appellant and appellee for said office of County Judge appellee had a majority to six votes, and therefore he was entitled to be posted and certified by the county clerk and Election Committee and officials of Ft. Bend County, Texas, the official nominee for the office of County Judge of Ft. Bend County, Texas, of the Democratic Party.

In the stipulation referred to in the court's judgment, also referred to as the joint motion of the parties, appellant and appellee moved the court to open the absentee ballot box and all other ballot boxes of the election precincts of Ft. Bend County, Texas, and recount and retally the votes cast and counted by election officials for the position of County Judge of Ft. Bend

County, Texas, in the Second Democratic Primary held June 4, 1966.

In such motion, which was signed by both parties and their attorneys and filed June 28, 1966, at the beginning of the recount in court, the parties represented to the court that while there was no fraud involved there were numerous and sundry technical irregularities which under the provisions of Section (10) of Article 13.30 of the Election Code justified a re-opening of the ballot boxes and a recounting and re-tallying of the votes cast in each of said boxes. It was further recited that an actual trial of all disputed issues in the cause would involve testimony from many Ft. Bend County voters and the opening of the "stub boxes", and matching the signature stubs to the ballots and exposing for whom the electors voted; that such would cause inconvenience and possible embarrassment to many residents of Ft. Bend County who voted in the election and that "rather than violate the sanctity of the secret vote, and in a spirit of fairness and from an unwillingness to take advantage of technicalities, both parties hereto have agreed and stipulated and do hereby agree and stipulate that they waive all rights to contest the election on any grounds other than that which is specifically agreed to herein."

The parties then agreed in such motion that all ballots cast and counted for the position of County Judge by the election officials in the Second Democratic Primary be recounted and retallied. It was specifically agreed and understood that the boxes containing "the signature stubs" would not be opened. It was further stipulated:

"(2) No ballot will be rejected and not counted except when the intent of the voter cannot be ascertained from the face of the individual ballot. Both parties further agree that should there be a difference of opinion between them as to whether or not the intent of the voter can be ascertained from the ballot, they

will abide by the ruling of the court in that regard.

"(3) It is specifically agreed that no objection will be made by either party to the lack of qualifications or disqualifications of any elector who cast a ballot in said election or to any irregularity in the vote or the casting of any ballot except that appearing from the face of the ballot."

It was further recited that both parties move the court after the court has retallied and recounted the ballots and votes cast in the June 4, 1966 election for County Judge, to enter judgment on the judgment form attached to the motion for the candidate receiving the majority of the votes.

The judgment of the court was entered on the same day as the hearing without objection or exception by either party, and the same was in accordance with the above mentioned agreement and stipulation of the parties, and their counsel, and constitutes a consent judgment. Thereafter on July 15, 1966 appellant filed what he designated as his motion to set aside and reform the judgment entered by the court, and in the alternative his amended motion for new trial. In such motion appellant alleged that he had discovered new evidence after the recount and tally of the ballots on June 28, 1966. He alleged that a fraud had been perpetrated which would change the result of the election and, among other things, that he would not have agreed to a recount of the ballots if he had known the facts. The nature and character of the newly discovered evidence was set forth in an affidavit of one Pete Humphrey attached to said motion, and the gist of such affidavit is that said affiant was positive that the tally sheet reflected the vote received by appellant as 47 votes and of appellee as 115 votes in the returns of Precinct No. 2, and that the ballots were correctly recorded on the election return signed by the election judge immediately after the polls closed. Affiant also stated that there were either two or three ballots

in the box at Precinct No. 2 which were not counted for either candidate because both names had been struck thereon, and that there were from six to ten ballots on which the voters who cast them had made no choice in the race for County Judge.

When the ballot box for the election for Precinct No. 2 was opened during the trial, and the ballots were recounted, it was found that appellant had received 45 votes and appellee 122 votes. It was alleged that the newly discovered evidence would show that the ballots placed in the ballot box for election Precinct No. 2 had been changed and tampered with, and that fraud had been perpetrated after the tally list was completed and after the results of the initial tally were placed upon the returns of the election judge of said precinct, one Willie Melton.

The evidence shows that Willie Melton was the election judge in charge of the ballot box of Precinct No. 2 at Kendleton, Ft. Bend County, Texas, some 15 miles from Richmond, the county seat, and that said Pete Humphrey acted as one of his clerks. Mrs. Vela Brown, Mrs. Selena Collins, and Mrs. Marcy Lee Walker also worked in the election as precinct clerks in Precinct No. 2, but there is nothing in the record to show that any of them gave an affidavit or testified. The motion to set aside the agreement that had been entered into by the parties and the judgment of the court was heard by the court on July 18, 1966, and the same was overruled.

The following occurred at such hearing: The Court stated:

"Gentlemen, I indicated the other day I didn't think that it would be in order to set aside this stipulation and agreement and waiver, and I think that is a matter of law, so we can proceed, that perhaps is the way you can make that determination. In other words, if you want to offer this as bill of exception to the rule, or any way you like, or any way it is more expeditious to you. If

you want to argue further the law, suit your judgment on that."

Appellant's counsel then stated: "The court mentions only the agreement. I assume the Court is overruling our motion to set aside the form of the judgment in that regard?" to which the court replied:

"Yes, sir. I feel like, in the first place, these lawsuits were either designed to get the ballots opened or keep them closed. In the beginning, there was resistance to opening the ballots, and I don't know whether they would have been opened except by agreement, so I feel the agreement is binding, or, in the alternative, a motion for a new trial, assume we would have a new trial, in the ordinary sense that new trials are granted, I think we would still be faced with the stipulation and agreement, and it would result in the same business again."

Then appellant's counsel stated: "If that is the Court's ruling, we would like to proceed under the bill of exception. We would like to call Mrs. Stubblefield."

Appellant's counsel called Mrs. Stubblefield and other witnesses, including the said Pete Humphrey, G. D. Birdwell, Berry Branch, Fred Jones, and Clyde Kennelly, and there was a full hearing on the bill of exceptions. Appellant's counsel did not request, as shown by the record, that the court hear any witnesses on the hearing of the motion to set aside the judgment and for new trial, and did not object or except to the failure of the court to do so. The court's ruling was that he didn't think it would be in order to set aside the stipulation and agreement and waiver of counsel, and the judgment that had been entered by the court, which, as stated, was a consent judgment. Although appellant's counsel did not object or except to such ruling, he did state that if that was the court's ruling he would like to proceed under a bill of exception. It is clear, therefore, that the bill of exception is directed only to the refusal of the court to set aside the aforesaid agreement entered into by the parties and their attorneys, and

the consent judgment which the court had previously entered.

■ Moreover, appellant's Points of Error Nos. 1 and 2 are to the effect that the court erred in refusing to grant said motion to reform and render judgment for appellant based upon the evidence of the returns and tally listed, and in the alternative to grant a new trial, after it was shown that the judgment rendered was based upon and supported by evidence showing false and fraudulent votes recorded upon ballots which had been altered after the election and prior to the time they were delivered to the county clerk. There is no assignment of error that the court refused to hear evidence. Both parties in their briefs refer to the evidence adduced by appellant in his bill of exceptions. Appellee does not complain that he was not given an opportunity to rebut such evidence. Even if we consider such evidence, our conclusion is not changed: that the court did not err in refusing to set aside the agreement and judgment aforesaid. Certainly there is no evidence that the agreement was procured by any false or fraudulent representations made by appellee or anyone acting for him, and the judgment itself was entered by the court after the recount and retally had been made on June 28, 1966, and was consented to by both parties.

■ In Ramsey v. Dunlop, 1947, 46 Tex. 196, 205 S.W.2d 979, it was held that appellate courts may consider fundamental errors although they are not assigned. It would be fundamental error if it appeared from the record that one was declared elected to public office when he had not received a majority or a plurality of the legal votes cast. The Court said in Ramsey v. Dunlop:

"Since the faith of our people stands inalienably pledged to the preservation of a republican form of government, Art. I, Sec. 2, Constitution of Texas, Vernon's Ann. St., a fundamental idea of which is that no one can be declared elected to public office unless he receives a majority or a plurality of the legal votes cast (29 C.J.S., Elections, § 243), Art. 3032, R.S.1925, must be regarded as declaratory of fundamental public policy in prescribing that the certificate of a candidate's right to take an office must show that he received the highest number of votes polled for any candidate therefor."

The question arises as to whether or not the evidence shows that appellee did not receive the majority of votes in the run-off election because the ballots in Box No. 2 were tampered with and changed. It is appellant's contention that the evidence does show that said ballots were in fact changed in some instances and that the changes and tampering with the ballots in the box in Precinct 2 did in fact change the results of the election and gave to appellee a majority of votes whereas appellant had received a majority of the legal votes cast.

■ Appellant relies mainly upon the testimony of Pete Humphrey and upon certain facts which appellant asserts show circumstantially that the ballots in the box of Precinct 2 were tampered with and enough of them changed to change the results of the run-off election. The evidence shows that the precinct judge, Melton, called out the votes and that Humphrey tallied most of the votes as the same were called out. Humphrey admitted that during the time he went out to lunch Mrs. Walker tallied about 15 votes. In his affidavit he stated that he tallied all the votes. He testified on the bill of exceptions that there were two or three spoiled ballots since both names were scratched thereon, and that there were six to ten that did not vote for either party. He admitted that he saw only two to three ballots individually and testified with respect to the other ballots: "I am going by the other ballots, which he said there was not a vote for either one." When shown some eight ballots and asked, "How many ballots of these eight do you find where no vote was cast for either candidate?" he replied, "I don't see but one." He also said that the rest of them had each candidate

scratched, and that, "As to my knowledge, we didn't have that many marked through. I only recall two or three." Although he testified he was certain there were six to ten unmarked ballots in the race for County Judge, he testified that Melton was calling the ballots and told him that there were six to ten not voted for either candidate. He didn't know whether they counted ballots with stubs on them. He admitted that Melton called out all the names, and finally testified: "I put it like this, I know we had more than one." The recount showed only one unmarked ballot. Humphrey further testified that Melton said, holding up a ballot, "Look how some people vote." Apparently this was the only ballot that Melton held up and exhibited. Humphrey's testimony with respect to what the ballots showed was as he testified, based upon what Melton said, and was hearsay with the exception of the two or three ballots which he said he saw "individually" and which would not have changed the results of the election.

The record indicates that there were certain irregularities in the election, but they were not confined to Precinct 2. Appellant contends that the circumstances indicate that there was fraud on the part of Melton in that he took the unlocked ballot box of Precinct 2 after the election was over, and that he was later seen that night at the court house where the ballot boxes were to be returned. The only witness who testified with respect to whether or not Melton showed up at the court house the night of the run-off election was Mr. Birdwell, and his testimony was very indefinite. The most he could say was that he believed he saw Melton at the court house before 10 o'clock on the night of the day of the election. Appellant further contends that the ballot box of Precinct 2 was unlocked, and that it and the returns therein were not delivered at the court house but that about midnight or 1 o'clock in the morning Melton turned over the box to the court house janitor at his home and requested that he deliver the same at the court house when

he opened up Sunday morning. The evidence shows that most of the election judges would merely telephone in the results of the election on the election night, and that some of them took in the ballot boxes that night. The evidence further shows, however, that all of the boxes were unlocked and locks were not placed thereon until after the boxes were turned over to the county clerk at the court house. It was further shown that it was not unusual for a precinct judge to turn his precinct ballot box over to the janitor and request him to deliver the same and that it had been done before, and further that some of the boxes were not delivered until as late as Tuesday. It was further shown that Melton was supporting appellee in the election and that he was apparently responsible for some marked sample ballots being sent out before the election, indicating that appellee was the one to vote for.

Unquestionably there were irregularities in the election which should not have occurred. Apparently such irregularities are not unprecedented in Ft. Bend County. The recognition that there were such irregularities was probably the reason for the parties and counsel entering into the agreement and stipulation hereinabove referred to, and the procedure with respect to the recount of the ballots. Although the variance between the number of ballots originally certified in Precinct 2 in the County Judge's election and the number of ballots recounted was larger than in the other ballot boxes, there were variances in some of the other boxes and also in the race for state officers in Precinct 2. We attach little importance to the fact that there were more ballots double struck in Precinct 2 in the hotly contested local race than in the races for Attorney General and State Board of Education, District 9.

The evidence further shows that the court house janitor took the ballot box of Precinct 2, as well as the stub box, to the court house early Sunday morning and deposited the same at or near the county clerk's office, where the deputy county

clerk, Pearl Ellett, found them after she arrived about 9 o'clock Sunday morning, June 5, 1966. She thereupon placed a lock upon the box and deposited it with the other boxes which had also been returned unlocked. There is also testimony by Humphrey to the effect that he was told by Melton that if he was asked anything concerning the ballot box of Precinct 2 to state that he didn't know anything.

There is evidence showing that there was an opportunity for Melton or perhaps others to open the unlocked ballot box of Precinct 2 as well as the boxes of other precincts, since the same were not locked as they should have been, and that it was therefore, possible for the ballots to be changed in some manner. There is no sufficient evidence of probative force that they were tampered with or changed. It is also possible that there could have been a mistake at the time the ballots were originally called out by Melton and tallied by Humphrey or one of the other clerks. It is a matter of common knowledge that mistakes do occur in the tabulation of ballots, and in the determination of which ballots should be counted. Appellant contends that at least three ballots with stubs attached were counted, one being counted for appellant. The number of ballots with stubs attached that were counted would not, however, in any way change the result of the run-off election.

The irregularities in the election were waived in the agreement, but in any event they were not such as were shown to have affected the results of the election. The law is well settled that irregularities in the conduct of an election which cannot be shown to have materially affected the results of the election are immaterial. Roberts v. Hall, Tex.Civ.App., 167 S.W.2d 621, and authorities there cited; Day v. Crutchfield, Tex.Civ.App., 400 S.W.2d 377; 21 Tex.Jur.2d, p. 448, Elections, § 179.

Appellant places much reliance upon the case of Henderson v. Albright, 1896, 12 Tex.Civ.App. 368, 34 S.W. 992. That case stands for the proposition that in the event of a disagreement between the returns and the ballots, the latter must prevail unless it appears that the ballots have been exposed to the reach of unauthorized persons so as to afford a reasonable probability of having been changed or tampered with. As far as the record shows in the instant case, the ballot box in question was kept by the election judge of Precinct No. 2 until he turned it over to the court house janitor for delivery to the County Clerk. The janitor testified that he did not fool with the box. We cannot say that under the circumstances surrounding the delivery of the box there is a strong or reasonable probability that the ballots were changed or tampered with. The most that can be said—as was stated in Henderson v. Albright, supra—is that "there was a possible opportunity for it to be done." See also Owens v. State, 64 Tex. 500. Since there was no satisfactory proof that the box in question was tampered with, it was proper for the court to determine the number of votes for each party by the number of ballots cast as shown on the recount.

At the conclusion of the hearing on the recount of the ballots, appellant's counsel stated: "If the Court please, we would like to recount Box No. 2. There is enough difference in the certified result of that ballot and the count we took today. We all want to be satisfied." Nothing further was said with respect to such matter and no objection or exception was taken to the fact that there was no further recount made. It should be noted also that in his amended answer and cross-action appellant alleged that as a result of fraud and illegal acts which occurred within and at the designated polling place in Election Precinct No. 2 on election day, the votes counted and tallied for appellant do not reflect all of the legal votes cast for him, although he could not allege with greater particularity the exact nature of the fraudulent acts. It seems quite doubtful that appellant exercised due diligence in not discovering earli-

er the grounds of alleged fraud later relied upon by him since he could readily have subpoenaed the clerks, including Humphrey, who assisted in Precinct 2, and interrogated them on the recount hearing. In view of our holding herein, it will not be necessary to decide whether or not appellant has shown due diligence in connection with his contention of newly discovered evidence.

█ We overrule appellant's point that the court erred in refusing to have the stub box in Election Precinct No. 2 opened in order that the testimony of the electors could be obtained for the purpose of showing that their ballots had been fraudulently changed. Appellant undertook on the bill of exceptions hearing to have the stub box of Election Precinct No. 2 opened in order to show signatures on certain ballots so that the persons who cast such ballots could be called as witnesses to testify on the bill of exceptions. No request was made on the hearing of the motion for new trial to open the stub boxes and there was no ruling thereon. There is no bill of exceptions directed at any refusal of the court in such connection. Therefore, any error of the court, if such there was, has not been preserved. Furthermore, even independently of the joint agreement that the stub boxes would not be opened, there was no sufficient evidence of probative force showing the probability of fraudulent changes of the ballots cast by persons whose signatures were on the stubs of such ballots, which would warrant the opening of the stub boxes.

In Duncan v. Willis, 1957, 157 Tex. 316, 302 S.W.2d 627, at 637, the court said:

"When it is determined by the trier of facts on sufficient evidence that a ballot has been fraudulently marked by another or that a spurious ballot has been substituted for that of the voter, the rule is that the voter may state how he intended to vote. Such testimony while recognized as a potential source of danger, is nevertheless accepted as a matter of necessity to prevent greater evils that would surely result from its exclusion."

█ It is also true that there may be certain public interests which outweigh the individual's right to have his ballot kept secret. Oliphint v. Christy, 1957, 157 Tex. 1, 299 S.W.2d 933. We are of the opinion, however, that even ignoring the agreement made by the parties in the instant case, there was insufficient evidence to establish a fraudulent substitution had been made of ballots or that same had been changed, which would justify opening up the stub box in Election Precinct No. 2 in order to obtain the testimony of the electors who voted in such precinct.

█ Appellant asserts that the court erred in depriving him of a portion of the statement of facts which prevented him from presenting material points of error on appeal to the appellate court. Shortly after appellant's motion for new trial was overruled he filed a motion in the trial court asking that the court enter an order directing the county clerk and sheriff of Ft. Bend County to deliver to the official court reporter all of the ballots introduced upon the trial of the case in order that they might be used as exhibits in the preparation of the statement of facts. Instead of entering such order, the court entered the following order:

"On this date came on to be heard in open court the foregoing motion and the court having fully read and considered the motion and heard arguments of the counsel thereon, is of the opinion that the individual ballots as such were not introduced in evidence on trial of this cause but that the unopened ballot boxes were received in evidence, and being further of the opinion that no objections to the counting of the ballots with stubs attached were made or ruled upon during the trial, and further that the ballot boxes should not be opened without a ruling of the court, it is accordingly ordered, adjudged and decreed that the County Clerk of Fort Bend County,

Texas, deliver to the official court reporter all of the unopened ballot boxes which were introduced during the trial of this cause, together with the keys in order that the same may be opened for inspection or count by any court of competent jurisdiction, and further that the boxes not be opened by the said court reporter or any other person without such an express order, and the clerk is directed to file this order among the papers of this cause, to which action the defendant excepts.

"Signed and entered this 27th day of July, A.D. 1966."

Appellant did not request on the hearing of this cause that the ballots be each individually introduced in evidence, nor did he object to the manner in which the ballots were recounted and tallied, nor to the counting of ballots with stubs attached thereto. There is nothing in the record to show that any ballots with stubs attached were counted except the one ballot with unsigned stub attached which was counted for appellant. The bill of exception on the motion for rehearing covers only the refusal of the trial court to set aside the agreement entered into by the parties and judgment which was entered by consent. No objection was made and no bill of exception was taken at the trial, and no error in connection with the trial has been preserved. Appellant has failed to show error in the court's ruling or that the counting of ballots with stubs attached, if any, would change the result of the election. Moreover, if this Court should conclude that it ought to inspect each of the ballots cast in the run-off election, it would not be deprived of doing so, since all the ballot boxes could be opened by this Court under the aforesaid order and inspected, and recounted and tabulated. We are of the opinion that the evidence is not such as to warrant any such action by this Court.

Appellant also complains that the court erred in rendering judgment for appellee since there were certain ballots with unsigned, undetached stubs. It is true that the trial court did count and credit one vote appearing on a ballot with undetached stub, and the court stated that he was going to rule that ballots with the stubs on them were valid votes. If the ballots had attached thereto stubs which were signed, they could properly be counted. Subdivision 3 of Article 8.15, Texas Election Code, provides that if the stub is still attached and is signed it shall be counted. We note in the bill of exceptions that there are only three ballots with unsigned stubs attached, one of which was counted for appellant. It is true that our Supreme Court held in Vicars v. Stokeley, 157 Tex. 182, 300 S.W.2d 623, in effect that ballots should not be counted when the corresponding stubs do not bear the signature of the voter. For the opinion of the Court of Civil Appeals, see 296 S.W. 2d 599. No objection was made at the time the court announced that he was going to count the ballots with stubs attached, and no exception was taken to such action by the Court. In any event, the record shows that one of the ballots with unsigned stub attached was voted for appellant rather than appellee, and that the other two ballots with unsigned stubs attached were double struck, that is, the names of both appellant and appellee were scratched, and, therefore, they were not counted for either party. We are of the opinion that any error committed by the court in counting the ballot cast for appellant, with unsigned stub attached, would not result in harm to appellant and was, therefore, immaterial. Rule 434, Texas Rules of Civil Procedure.

Appellant's other points are sufficiently covered in the opinion of this Court in considering the points hereinabove discussed, and the same are overruled.

Judgment affirmed.